COURT OF APPEALS OF VIRGINIA

Present:    Judges Benton, McClanahan and Senior Judge Coleman
Argued at Richmond, Virginia

RICHMOND DEPARTMENT OF
  SOCIAL SERVICES
                                                          OPINION BY
v.       Record No. 1220-05-2          JUDGE JAMES W. BENTON, JR.
                                                        JANUARY 31, 2006
ASHLEY CRAWLEY

            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                          Randall G. Johnson, Judge

            Kate D. O'Leary; Richard G. White, Jr., Guardian *ad litem* for the
            minor children (Sarah M. Denham; Office of the City Attorney, on
            brief), for appellant.

            Robert W. Carll for appellee.


        The Richmond Department of Social Services appeals the trial judge's denial of its

petitions to terminate Ashley Crawley's residual parental rights and to grant the Department the

authority to place the children for permanent adoption.  The Department contends that it met its

burden of proof and that the trial judge's decision was plainly wrong and without evidence to

support it.  We disagree and affirm the judgment.

                                              I.

        On appeal, we review the evidence in the light most favorable to Ashley Crawley, as the

prevailing party below.  See McGuire v. McGuire, 10 Va. App. 248, 250, 391 S.E.2d 344, 346

(1990).  So viewed, the evidence proved Crawley gave birth to a daughter on September 22,

2000, and a son on December 5, 2001.  Crawley was last a full-time employee in 2000, the year

her daughter was born.  In April 2001 before her son was born, Crawley and her husband were

living in an apartment.  That month, Crawley and her husband separated, and Crawley had to

leave the apartment they had been leasing. From that time to August of 2003, Crawley lived in various hotels with her children.

After their separation, Crawley and her husband had an informal agreement that she would care for their children and he could visit with them on weekends. In late 2002, however, Crawley's husband absconded with their children and kept them for three or four months. For a while, Crawley could not find him or the children. After locating her husband, Crawley filed a petition for custody of the children. When Crawley attended the custody hearing, she learned her husband was in jail and the children were in foster care. The Department returned the children to Crawley and filed a petition against Crawley's husband for neglect and abuse.

The Richmond Department of Social Services assigned Linda Muhammed, a caseworker, to assist Crawley and her children in stabilizing their circumstances. On August 6, 2003, Muhammed helped Crawley, who was then homeless, to obtain living accommodations in a hotel. With guidance from Muhammed, Crawley found an apartment that was appropriate for her and the children, but was unable to secure a co-signer as required by the lessor. Muhammed also tried to help Crawley find employment, and she testified Crawley "did very well" in the Department's programs to encourage employment and to maintain financial services. However, in September of 2003, Crawley was hospitalized and underwent surgery for a medical condition.

Prior to hospitalization, Crawley arranged for her cousin to care for the children. While Crawley was in the hospital, her cousin took the children to their paternal grandmother, who later contacted the police and requested them to place the children elsewhere. When the Department informed Crawley of the children's plight, Crawley arranged for the children's sitter to care for them. After caring for the children a short while, the sitter was unable to provide for the children and maintain her work schedule. The Department then filed a petition for custody and

transferred the children to foster care in October 2003 because no family member was able to care for them.

While Crawley was in the hospital, Deshanda Artis, a foster care worker, received the case and contacted Crawley. Crawley told Artis she did not know when the hospital would release her and she had no place to live. When Crawley left the hospital, she contacted Artis and asked to see her children. Artis arranged a visit for Crawley with the children and began to help Crawley in her search for housing. Artis also referred Crawley to various programs that the Department required Crawley to complete in order to regain custody of her children, including substance abuse assessment, a parenting class, and an anger management class.

Between October 20 and the following January, Artis had only sporadic contact with Crawley. During this time, Crawley was unemployed and lived in hotels while waiting for housing to become available through the public housing authority and an apartment complex. In the meantime, Crawley had developed a good relationship with the children's foster parent and made arrangements with the parent to regularly visit her children. Crawley, however, missed a meeting she had scheduled with Artis and did not receive the referral information the Department had prepared for the programs she was required to complete. Crawley did not participate in these programs.

Crawley was incarcerated on January 2, 2004, for forging, uttering, and grand larceny. Crawley testified that she received forged checks as payments for completing odd jobs. Initially, she cashed the checks without realizing they were forged but continued to cash the checks after learning of the problem. Crawley testified that she received a fifty-year sentence, which was suspended except for two years and two months incarceration. During her incarceration, Crawley maintained contact with her children. The foster parent arranged three contact visits and one non-contact visit between Crawley and the children. The foster mother also testified that

Crawley called the children almost every night and that Crawley has a positive relationship with her children. The foster care worker agreed that Crawley loves her children and testified that Crawley has expressed a desire to have her children returned to her when she is released from jail.

During her incarceration, Crawley finished a twelve-week substance abuse program at the jail. She investigated taking an anger management class and a parenting class, but she learned that the jail only offered these classes to male prisoners. Crawley testified that she does not have any definite plans for how she will obtain employment or secure housing after her release. She described possible avenues, however, by which she may be able to reach those goals. Crawley testified that she recognizes the need to independently provide for her children and herself.

Although the juvenile and domestic relations district court granted the Department's petition to terminate Crawley's parental rights, on appeal to the circuit court the trial judge ruled that terminating Crawley's parental rights was not in the children's best interests. In denying the Department's petitions, the trial judge reasoned as follows:

> The Court has to decide whether Ms. Crawley without good cause has been unwilling or unable to remedy substantially the conditions which led to or required continuation of the children's foster care placement. And I think the evidence leads to that conclusion that she has not done it. But we've got to look at the reasons she hasn't done it. She hasn't done it—at least since January of last year—because she's been incarcerated. She doesn't really have a good excuse for not doing it before then . . . .
>
> So I guess in a technical sense, the Department has carried its burden of showing by clear and convincing evidence that Ms. Crawley had not remedied substantially the conditions that led to the children being in foster care. But there's another very important part of this puzzle . . . [a]nd that is whether termination of Ms. Crawley's parental rights [is] in her children's best interests. And I don't think that it is. The fact that she has not really had a full opportunity to do what she needs to do to remedy the situation in the Court's mind makes it not in [the children's] best interest to terminate Ms. Crawley's parental rights.

The Department contends the trial judge's ruling was plainly wrong and without evidence to support it and that the trial judge "substituted [his] personal judgment in place of the law." The Department argues that the evidence mandates a termination of Crawley's parental rights because of unstable housing, Crawley's criminal acts, her history of unemployment, the children's maladaptive behaviors, and a lack of evidence that Crawley will ever be able to properly care for the children. Crawley responds that the trial judge correctly ruled that clear and convincing evidence did not establish that termination was in the children's best interest.

The Supreme Court of Virginia has recognized the need to "respect . . . the natural bond between children and their natural parents." Weaver v. Roanoke Dep't of Human Res., 220 Va. 921, 926, 265 S.E.2d 692, 695 (1980). This is a reflection of a societal and governmental imperative: "The preservation of the family, and in particular the parent-child relationship, is an important goal for not only the parents but also government itself." Id. Because of the importance of the parent-child relationship, the legislature has mandated that a court may terminate parental rights after a child has been placed in foster care by court commitment only if:

> the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
> 1. The parent . . . ha[s], without good cause, failed to maintain continuing contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care . . . or
>
> 2. The parent . . . , without good cause, ha[s] been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement . . . .

Code § 16.1-283(C).

Under this section of the statute, a trial judge must make two separate inquiries in order to terminate parental rights. The first prong is to determine the child's best interests. The second prong relates to the parent's relationship with the child or remedying of the conditions that led to foster care, either of which is determined by reference to a particular timeframe. The trial judge found in this case that, "in a technical sense," the Department showed that Crawley did not remedy the conditions leading to foster care, but that "she has not really had a full opportunity to do what she needs to do to remedy the situation." The trial judge also found, however, that the Department did not meet the first prong of proving termination was in the children's best interests.

In each subsection of the statute, the child's best interest is the threshold test. See Code § 16.1-283. Thus, we have held that, when considering a termination of parental rights, "[t]he child's best interest is the paramount concern." Wright v. Alexandria Div. of Soc. Servs., 16 Va. App. 821, 827, 433 S.E.2d 500, 503 (1993). In making this determination about the best interests of the children, the trial judge must consider many factors, including the following:

> the age and physical and mental condition of the . . . children, the age and physical and mental condition of the parents; the relationship existing between each parent and each child; the needs of the . . . children; the role which each parent has played, and will play in the future, in the upbringing and care of the . . . children, and such other [necessary] factors . . . .

Barkey v. Commonwealth, 2 Va. App. 662, 668, 347 S.E.2d 188, 191 (1986).

When we review a trial judge's decision concerning the best interests of children and parental rights, we presume the "trial court . . . thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990); see also Brown v. Brown, 218 Va. 196, 200, 237 S.E.2d 89, 92 (1977). Moreover, the trial judge's "determination is considered to have settled all conflicts in the evidence in favor of the prevailing party, and the

prevailing party's evidence is entitled to all reasonable inferences fairly deducible therefrom." Farley, 9 Va. App. at 328, 387 S.E.2d at 796. Therefore, we will not disturb the trial judge's finding unless it is "plainly wrong or without evidence to support it." M.G. v. Albemarle County Dep't of Soc. Servs., 41 Va. App. 170, 181, 583 S.E.2d 761, 766 (2003). Here, the trial judge commented extensively during the closing arguments and made findings on the record reflecting that this decision was "not an easy one" but that he had given considered judgment to the evidence and factors germane to the children's best interest.

The record indicates Crawley lost her apartment after she and her husband separated. Prior to that time she had been employed but became unemployed after the birth of her second child. After the separation, Crawley was the primary caregiver for her infant children until she was hospitalized and they were placed in foster care. Between her release from the hospital and her incarceration, she made efforts to find housing and employment. Although Crawley did not provide a stable home for her children before her incarceration, she continually sought stable housing and employment and she cooperated with the two Department caseworkers in those efforts. Crawley also maintained contact with her children.

The parenting and substance abuse counseling were required before Crawley could regain custody, but were not the reasons the Department took the children into foster care. The caseworker's testimony that Crawley's hospitalization precipitated the children's placement in foster care supports the trial judge's finding "that the only reason [the children] were placed into foster care was that Ms. Crawley was in the hospital, and there was no one else available to take care of them." It is within this context that the trial judge rejected the Department's argument that terminating Crawley's parental rights is in the best interest of the children.

"The fundamental liberty interest of natural parents in the care, custody and management of their child[ren] does not evaporate simply because they have not been model parents or have

- 7 -

lost temporary custody . . . to the State." Santosky v. Kramer, 455 U.S. 745, 753 (1982). If there is "reason to believe that positive, nurturing parent-child relationships exist, the [state's] *parens patriae* interest favors preservation, not severance, of natural familial bonds." Id. at 766-67. In making his determination, the trial judge did not err in considering these factors and the circumstance that led to the children being placed in foster care.

The Department points out that we have recognized in the past "'[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming . . . responsibilities.'" Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995) (alteration in original) (quoting Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990)). In Lecky, the trial judge made three findings: that termination was in the child's best interest, that the mother had been unwilling to remedy the conditions that led to foster care within twelve months, and that the mother's age provided good cause under subsection (C)(2) to avoid termination. 20 Va. App. at 312, 456 S.E.2d at 541. On appeal, we ordered termination of the mother's parental rights partially because the record did not suggest "that the mere passage of time would resolve her difficulties." 20 Va. App. at 312, 456 S.E.2d at 541. In this context, we discussed the interest of the child and rejected the trial judge's ruling that the "mother's 'age' provided 'good cause' or excuse for her unwillingness or inability to cure timely the circumstances which gave rise to foster care." Id. at 312, 456 S.E.2d at 541. There, the mother persistently ran away from home, leaving her child behind. Id. at 309, 456 S.E.2d at 539. She and the child were "emotionally distanced," and their interaction together "was . . . evocative of one between a babysitter and a child." Id. (alteration in original). That is not this case.

The lack of a definite timeline in which a parent will be able to comply with social services' plan is a relevant factor under the statute, but is not alone dispositive of the inquiry the

trial judge must make under the statute. Crawley did not ask the circuit court judge to give her unlimited time to remedy her situation, but rather to postpone terminating her parental rights until her release from jail and after she had the opportunity to comply with the Department's requests. Although her exact release date was unknown at the time of the circuit court hearing, it was scheduled to occur approximately nine months after the hearing.

In considering the reasonableness of the requests, the trial judge factored in the efforts Crawley had made to comply and to maintain contact with her children. During Crawley's incarceration, she took a substance abuse class, as required by the Department. She inquired about other classes that the caseworker suggested, but was ineligible to participate in the programs offered at the jail. For Crawley, "the mere passage of time" does not guarantee that she will resolve her difficulties, but it does remove the absolute barrier that prevents her from doing so.

Unlike in Lecky, Crawley has maintained a relationship with her children, talking to them almost daily. The caseworker testified that Crawley loved her children. The foster mother echoed this view when she testified that Crawley and the children have a positive, warm relationship. Crawley's attempts to comply with the Department's requirements, her ongoing relationship with her children, and the testimony about the nature of the relationship between Crawley and her children demonstrated that a "positive, nurturing parent-child relationship" existed.

The Department suggests that the evidence established that the children exhibited "maladaptive behavior," which stemmed from improper parenting and was evidence that the termination was in their best interest. True, the foster parent testified that the children misbehaved when they came into her foster care, but that evidence alone does not prove that the children suffered under their mother's care. The children had been in several environments

while the mother was hospitalized. Indeed, this was their second foster care home. In this instance, as in others, the Department's evidence was merely speculative and simply was not clear and convincing to the trial judge.

The trial judge similarly rejected the Department's claim that the evidence proved the children engaged in play that mimicked sexual intercourse. The foster mother testified that once when the children took a bath together, the daughter laid on her back with her brother on top of her and encouraged him to suck her chest. The daughter was then three years old, and the son was eighteen months old. The trial judge found the evidence insufficient to conclude that the bathtub incident was a sexual act. He ruled that the evidence rendered it equally probable that the daughter just as likely could have been mimicking breastfeeding.

Viewing the evidence in the light most favorable to Crawley, the record reveals a loving mother whose desperate poverty, hospitalization, and marital circumstances precipitated her two young children's placement into foster care. Indeed, the record supports the trial judge's "take on the evidence . . . that the only reason [the children] were placed into foster care was that Ms. Crawley was in the hospital, and there was no one else available to take care of them." The evidence also supports the trial judge's conclusion that the children's best interests required that Crawley have the opportunity to realize her goal of remedying her living situation and parenting skills as the Department requires in order to retain her parental relationship with her children. We hold, therefore, that the trial judge did not err in denying the petitions to sever Crawley's parental rights. The Department did not prove with clear and convincing evidence that terminating Crawley's parental rights would serve the children's best interests. Accordingly, we affirm the decision.

<u>Affirmed.</u>