COURT OF APPEALS OF VIRGINIA


Present:    Judges Elder, Clements and Senior Judge Annunziata


SHANNON FAUNCHER-WHITNEY

                                                        MEMORANDUM OPINION[*]
v.      Record No. 0742-06-1                                PER CURIAM
                                                          OCTOBER 10, 2006
CITY OF HAMPTON DEPARTMENT
 OF SOCIAL SERVICES


                FROM THE CIRCUIT COURT OF THE CITY OF HAMPTON
                           Wilford Taylor, Jr., Judge

            (Carter Phillips; Weisbrod & Phillips, P.C., on brief), for appellant.

            (Rachel Allen, Assistant City Attorney; Tonya Henderson-Stith,
            Guardian *ad litem* for the infant child; McDermott, Roe & Walter,
            on brief), for appellee.


        Shannon Fauncher-Whitney (hereinafter "mother") argues that the trial court erred by

terminating her parental rights to her minor child, K. Upon reviewing the record and briefs of the

parties, we conclude that this appeal is without merit. Accordingly, we summarily affirm the

decision of the trial court. Rule 5A:27.

                                    Background

        K., born June 12, 1999, was removed from her mother's custody and placed into the care of

the City of Hampton Department of Social Services (DSS) on October 14, 2003. The initial foster

care service plan, approved on December 23, 2003, established concurrent goals of return to parent

and placement with a relative.

        At the time of removal, K. had been living with her mother and stepfather, as well as three

siblings. In January 2002, a protective order was entered in an attempt to prevent removal. The

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

order required the parents to complete a parenting education course, refrain from inappropriate physical discipline, maintain a clean and safe home, provide the children with routine and emergent health care, and ensure that the children receive evaluations through their public schools.

While the family completed some of the services offered, it failed to clean the home adequately and remove safety hazards. DSS continued to receive complaints about the family, and Shannon Mitchell, a social worker for the City of Hampton, visited the home in October 2003 to investigate. She found the home was dirty, old food was left on countertops, and used paper dishes were left in the kitchen and living room. Furthermore, power tools were left within reach of the children.

While DSS had received complaints regarding all four children, K.'s condition was a special concern. DSS had received complaints from K.'s school that she was so dirty and foul-smelling that her clothes had to be changed upon her arrival there. Although she was four years old, she weighed approximately twenty pounds, and had not gained weight in over a year. School personnel reported she frequently cried at school and could not be consoled until she was given food. When Mitchell visited the Whitney home, she found K. unattended lying on her bedroom floor with the door shut. As a result of these findings, K. and her siblings were removed and placed in foster care.

K., who suffers from Cornelia de Lange Syndrome,[1] is severely mentally retarded and physically delayed. At the time of removal, she could sit for only short periods of time. She could not speak or walk or use the toilet without assistance; furthermore, she exhibited self-abusive behavior such as hitting herself. She aspirated liquids, a condition which required her drinks to be thickened so she could consume them. She also suffered from acid reflux syndrome.

Since K.'s removal, she has remained in the same foster home, and her condition has improved dramatically. Her foster mother, Susan Garrett, has twenty-three years' experience

---

[1] Cornelia de Lange syndrome, also known as Bachmann-de Lange syndrome, is a genetic disorder present from birth.

working with special needs children, including children with severe disabilities.  Garrett, who is committed to adopting K., has taken her to physical therapy, orthopedic appointments, and genetic specialist appointments, as well as to her pediatrician and gastroenterologist.  Because she hits herself and knocks out her ear tubes, Garrett has taken her for four surgical procedures in two years to replace the tubes.

Since K.'s placement with Garrett, she has attended a school for children with severe disabilities.  She has gained weight, and has learned to walk with a walker and feed herself independently.  She can also assist in dressing herself.  While she cannot speak, she has learned to communicate by using a device that, among other things, enables her to express her need to eat or sleep.

Social worker Brenda Thomas, assigned to K.'s case subsequent to her removal, prepared the initial foster care service plan.  That plan required mother to meet the following requirements to facilitate K.'s return home:

- "[d]emonstrate the mental and emotional stability [required to] . . . parent the child free from abuse and neglect" by completing a parental capacity evaluation and anger management classes;

- "[d]emonstrate the knowledge of the child's developmental, age-appropriate socialization, recreational, emotional needs" by completing two nurturing programs and a program for parents of children with special needs;

- "[d]emonstrate the commitment and ability to maintain a strong and effective marital bond" by engaging in marital therapy;[2]

---

[2] According to Thomas, marital counseling had been included in the service plan because of domestic violence issues in the marriage.  At the circuit court hearing, DSS maintained the juvenile and domestic relations district court (juvenile court) omitted this requirement from its order because mother represented she and her husband were seeking a divorce.  Nevertheless, mother continued to live with her husband and, during the nine-month period following the

- "[d]emonstrate the ability to provide for the physical needs of the child";

- "[p]rovide a safe, sanitary, and secure home . . ." by "remov[ing] clutter and hazardous materials, [and] clean[ing] and repair[ing] home . . .";

- "[d]emonstrate commitment to work with the Department towards the goal of "Return to Parent" by meeting regularly with the assigned reunification specialist, attending meetings, appointments, and classes, and maintaining contact with the Department;

- "[v]oluntarily make financial contributions toward the support of Child in Foster Care [sic]";

- "[c]ontinue to establish and build a parental relationship with the child" by adhering to monthly visitation schedule.

Mother completed the parenting classes, but did not successfully complete individual counseling which she began on March 1, 2004 and discontinued after one session because she did not believe it was helpful. At Thomas's encouragement, mother returned to counseling with a different provider on May 7, 2004; however, she stopped on August 30, 2004, because "she felt the therapy was not going to help her get her children back."

Furthermore, mother did not maintain her relationship with K. by taking advantage of the visitation opportunities made available to her. According to Linda Brown, who supervised visitation between mother and her children, mother was "authorized two visits per month," thereby entitling her to ten visits between July and November 2004. Mother, who visited only four times with K. during this five-month period, testified she was required to use five of the ten allotted visits to see her other children. However, she acknowledged that when her other children moved out of

approval of the initial plan, the couple continued to experience domestic violence difficulties until they separated in September 2004. According to mother, she called 911 in September 2004 when she came home to find her husband in a "temper rage." She stated "all of my things were on the front lawn and I didn't want to confront him, so I made him leave."

Virginia, she could have used the time slots for additional visitation with K., but failed to do so. When asked if there was a reason, she replied, "No."

Even after the goal was changed to adoption, mother did not pursue visitation with K. Although the foster mother agreed to mother's visitation with K., mother visited only once, explaining, "I just couldn't do it . . . . After the goal was changed it was hard for me to see [K.] . . . ." She stated, "I was working and I needed to get my life together before I could start visiting with my daughter, so that it would be better for my daughter, so that I wouldn't be as emotionally strained."

Even when mother visited with K. during visits supervised by DSS, Thomas noted mother appeared detached. According to Thomas, "it would be Mr. Whitney that would take [K.] and take her into the room and it would be him that engaged with the baby. Ms. Whitney would sit on the couch and she would . . . reach down and pet the baby every now and then, but there was not a lot of interaction with [K.]"

In addition, Thomas testified mother was unable to demonstrate the ability to provide for K.'s physical needs, such as food and shelter. Although mother worked two jobs after separating from her husband, she lacked the funds necessary to meet her financial obligations, even without the additional burden of caring for K.'s special needs. Thomas stated mother was behind in paying her utilities bills, that she had received an eviction notice, and that her water service was cut off.

Thomas suggested that mother use the agency's day care services for her children until she could get back on her feet, but mother refused to use the services unless they could be provided at her home. Mother noted that her job required her to work late some nights and on weekends; she also was taking classes on her computer.

At the circuit court hearing, mother was asked if she were ready for her child to be returned to her she answered, "I'm going to need some help with this child, because I can't be there 24/7 and

work and go to school." She acknowledged that K. was "doing extremely well" in foster care for several reasons, including the fact "she [was not] in a stressful household."

On November 23, 2004, the juvenile court amended the goal from return home to adoption. An amended foster care service plan was prepared, and on January 24, 2006, the juvenile court terminated mother's parental rights. Mother appealed to circuit court, which affirmed the lower court's ruling on March 10, 2006. This appeal followed.

Analysis

Mother raises two issues on appeal: whether the evidence was sufficient to support the trial court's termination of her parental rights, and whether she substantially complied with all of the court's orders. In essence, both arguments assert that the evidence was insufficient to support the trial court's termination decision under Code § 16.1-283(C)(2).

When reviewing a decision to terminate parental rights, we presume the circuit court "'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265-66, 616 S.E.2d 765, 769 (2005) (quoting Fields v. Dinwiddie County Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). "In its capacity as factfinder . . . the circuit court retains 'broad discretion in making the decisions necessary to guard and to foster a child's best interests.'" Id. at 266, 616 S.E.2d at 769 (quoting Farley v. Farley, 9 Va. App. 326, 328, 387 S.E.2d 794, 794 (1990)).

"The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Id. (quoting Logan v. Fairfax County Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991) (citation omitted)). Furthermore, the evidence is viewed in the light most favorable to the

prevailing party below and its evidence is afforded all reasonable inferences fairly deducible therefrom.  Farley, 9 Va. App. at 328, 387 S.E.2d at 795.

Code § 16.1-283(C)(2) requires clear and convincing evidence that termination is in the best interests of the child and that

> the parent . . . without good cause, ha[s] been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

Mother argues DSS failed to present clear and convincing evidence she failed to remedy substantially the conditions which led to K.'s removal.  She claims she removed clutter from her home and painted the home; she completed parenting classes, as well as the parental capacity evaluation, and also completed individual counseling.  Furthermore, she asserts that the improvements in K.'s weight and physical condition were the result of medical treatment she had scheduled prior to K.'s removal.  Finally, she maintains that she separated from her husband to eliminate the marital discord in K.'s life, but when she did so, DSS refused to return K. because she lacked the financial ability to care for K.  When mother took a second job to increase her income, she claims DSS refused to return K. because she was working too many hours.

At the outset, we note that much of the evidence on which mother relies to support her argument was in dispute before the trial court and, on appeal, we are bound to review the evidence in the light most favorable to DSS, the prevailing party below.  Farley, 9 Va. App. at 328, 387 S.E.2d at 795.  While mother claims to have improved the living conditions in her home, Thomas testified mother's house was "not sanitary" and was cluttered with old food boxes and papers.  Thomas noted, "Toward the end when we kept reminding her, you must clean the house up, she started putting forth some effort, but by that time her husband had left and then the

- 7 -

house became cluttered again." In fact, DSS had taken steps to encourage mother to improve her living conditions even before K.'s removal, but mother had failed to take the steps necessary to make those improvements.

Furthermore, mother refused to consider the child care providers suggested by DSS because she wanted to have child care in her home. Nevertheless, mother acknowledged, "I'm going to need some help with this child, because I can't be there 24/7 and work and go to school." She also conceded that K. was doing "extremely well" in foster care, in part because she was no longer "in a stressful household." Finally, mother failed to take advantage of the several opportunities she was given to visit with K., explaining, in her words, "it was hard [and] she just couldn't do it." Based on this evidence, we cannot say the trial court abused its discretion in finding mother failed to remedy substantially the conditions which led to or required the continuation of K.'s foster care.

"[W]hen considering a termination of parental rights, 'the child's best interest is the paramount concern.'" Richmond Dep't of Soc. Servs. v. Crawley, 47 Va. App. 572, 579, 625 S.E.2d 670, 673 (2006) (quoting Wright v. Alexandria Div. of Soc. Servs., 16 Va. App. 821, 827, 433 S.E.2d 500, 503 (1993)). "'[I]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming . . . responsibilities.'" Lecky v. Reed, 20 Va. App. 306, 312, 456 S.E.2d 538, 540 (1995) (alteration in original) (quoting Kaywood v. Halifax County Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1995)).

K. has remained in the same foster home since her removal, and her condition has steadily improved. She has gained weight, she has learned to communicate, and she has been placed in a school which can address her special needs. Her foster mother has over twenty years' experience in caring for children with special needs, and has expressed a commitment to adopting K. Under these

circumstances, we cannot say the trial court abused its discretion in finding termination was in K.'s best interests.  Accordingly, we summarily affirm its decision.  Rule 5A:27.

<u>Affirmed.</u>