COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Clements and Senior Judge Annunziata


TAMIKA KASEY

                                                MEMORANDUM OPINION<sup>*</sup>
v.      Record No. 2896-06-3                         PER CURIAM
                                                   APRIL 10, 2007
ROANOKE CITY DEPARTMENT OF SOCIAL SERVICES


             FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
                       William D. Broadhurst, Judge

             (Sarah Jane Wells; Huffman & Nixon, P.C., on brief), for appellant.
             Appellant submitting on brief.

             (William M. Hackworth, City Attorney; Heather P. Ferguson,
             Assistant City Attorney; J. Christopher Clemens, Guardian *ad litem*
             for the minor children; Clemens & Clemens, P.C., on brief), for
             appellee.  Appellee and Guardian *ad litem* submitting on brief.


        Tamika Kasey (hereinafter "mother") contends the trial court erred in terminating her

parental rights to her minor children, "J.S." and "J.L."  For the reasons stated herein, we affirm

the trial court's decision.

                                        Background

        We view the evidence in the light most favorable to the prevailing party below and grant

to it all reasonable inferences fairly deducible therefrom.  See Logan v. Fairfax County Dep't of

Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991).  So viewed, the evidence

proved that on June 19, 2003, the Roanoke City Department of Social Services ("DSS") removed

mother's two children after they were left unattended.  At the time of removal, J.S. was four

years old, and J.L. was three years old.

_____

        <sup>*</sup> Pursuant to Code § 17.1-413, this opinion is not designated for publication.

The initial goal established by the foster care service plan was to return the children to their home. The plan required mother to attend parenting classes, obtain and maintain employment and suitable housing, and attend scheduled visitation. Mother was also required to undergo psychological evaluation and drug testing.

Following the boys' removal, mother's employment was sporadic and short-term, and she required assistance from DSS with her utility bills. She attended parenting classes, but her instructor noted she "wasn't paying attention at all" and that "[t]here were times that she was caught sleeping in class." In response to questions, her typical responses were "I don't know" or "I've never experienced that with my children." The instructor concluded that mother had not benefited from the program.

In May 2004 mother underwent a psychological evaluation. Her IQ was 59, placing her in a mild retardation range. In addition to her intellectual limitations, mother also was found to have "significant emotional features that would probably make it difficult for her to form lasting or stable interpersonal relationships, and that . . . her parenting skills . . . [were] quite limited." The evaluation revealed that mother "couldn't develop any insight about how . . . [to] nurture a relationship with a child . . . to help a child not to repeat the same behaviors, or to redirect the child's behavior in a situation in which there was conflict or misbehavior." Roger LaPlace, who performed the examination, noted that parenting a special needs child "would present far more difficulty" for her.

The psychological evaluation was consistent with the behaviors observed by the social worker during mother's visitation with the children. Jenny Roberts, the supervising social worker, stated mother had difficulty maintaining control over the children, who "were often times climbing and jumping off the book shelves" during visitation. Roberts described mother as "cooperative," but did not believe mother "benefited from the services . . . offered her."

Mother's lack of parenting skills became evident during in-home unsupervised visitation, which began in November 2004. The visitation was terminated in February 2005 after one of the children returned with a two-inch bruise on his buttocks. A founded complaint for physical abuse resulted from this incident.

Supervised visitation continued, but was terminated in May 2005 upon the recommendation of the boys' counselor, Sharon Brammer. Brammer, who began treating the boys in August 2003, noted "a decline" in the boys' behavior following their overnight visits with mother. Brammer opined that the boys had developed a "trauma bond"[1] with their mother which was exacerbated by further visitation.

Both boys had multiple behavioral problems for which Brammer was treating them, including hyperactivity and aggressive and violent behaviors. Specifically, J.L. had a history of temper tantrums, use of profanity, and threatening caregivers, and demonstrated significant sexual behaviors in his play with dolls. He displayed symptoms of fetal alcohol syndrome and suffered from seizures, hand tremors, and learning problems.

Initially, Brammer noted J.L. was "aggressive, nomadic . . . always wanting food," but after the first two sessions, "he accepted limits fairly well." As therapy continued, his "response

_____

[1] Brammer explained a "trauma bond" as follows:

> A trauma bond is, well, a child will form a bond or an attachment, although this I would call . . . not an ordered or secured attachment with a parent or care giver and when there is a trauma associated with someone who is supposed to be a care giver, it cause[s] significant distress to the child, because the child's brain says this person is supposed to care for me, and can't put the two together because there's trauma associated with this care giver. . . . [Visitation] . . . is retraumatizing. The child with a trauma bond most likely would have a diagnosis of post traumatic stress disorder or acute stress disorder, which is, and it's, it's like a trigger . . . [for] . . . the same feelings . . . they had during the trauma.

to nurturing behaviors" improved, and he became "calmer" and "more focused." Shortly after his placement in foster care in August 2004, J.L. had improved sufficiently to reduce his counseling sessions from weekly to bi-monthly.

When visitation with mother began in the fall of 2004, J.L.'s behavior began to deteriorate, with the "most significant deterioration" taking place in February 2005. At that time, he became "much more" hyperactive and "returned to aggressive play," a behavior Brammer had not seen "in a long time." Brammer testified that

> [h]e seemed to dissociate . . . [to] go[] blank as if remembering something. At that point, I did a forensic interview[2] with him about his visit with his mom. There was extreme violence during the next sessions. Tearing up his . . . socks until they were shreds, and . . . some bizarre behavior . . . that . . . continued for a while . . . and then finally, his behaviors were so bad that he was sent to [a facility]. I still have not seen him back to where he was when he had the first improvement. He's still kind of dissociate[d], not with it.

As to J.S., he suffered from sleeping and speech difficulties, in addition to having a "fascination with knives" and using excessive profanity. Brammer noted he had an "excessive focus on food" and was compulsively concerned with cleaning. He engaged in violent play, such as drowning babies, and was "extremely" hyperactive. J.S. demonstrated a "blunted affect," i.e., he did not react emotionally.

With treatment and medication, J.S.'s behavior improved. After his first unsupervised visit with mother, however, Brammer noted he returned to "his extremely blunted affect." By late February 2005, J.S. returned to "trauma play"[3] and exhibited such a high level of anxiety that Brammer suggested medication.

---

[2] Brammer questioned the boys in February 2005 about their visitation with mother following a report of physical abuse, and provided their responses to DSS.

[3] Brammer described this as "lots of sword play, lots of cutting heads off, killing people."

- 4 -

When visitation with mother was terminated, J.S.'s behavior "started to calm down a little bit," but Brammer continued to harbor "great concerns" about him. She noted he had an "obsession about sex" and "extreme problems with sleep." She also stated he had "a problem with remorse . . . typical of children with attachment disorder," and "some aspects of [the] beginning of an anti-social personality disorder."

Beginning in November 2004, Brammer met with the mother on four occasions in an attempt to assist her in parenting and facilitate the boys' return home. Brammer described mother as "very receptive" to her parenting suggestions, but observed she had "a limited ability to parent." Brammer opined that termination of mother's parental rights was in the best interests of the children.

DSS provided numerous services to the boys to address their special needs. These services included speech therapy, psychiatric and psychological counseling, weekly "mentoring" sessions, and medication. J.L. was referred to a ninety-day psychological and neurological evaluation, and a similar evaluation was being investigated for J.S. Both boys received special education services in school.

At the termination hearing, mother admitted having two founded complaints for neglect and abuse with respect to the boys. She denied striking J.L. with a belt, although she conceded she did not appeal the founded complaint of abuse against her.

Analysis

When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests. See Toombs v. Lynchburg Div. of Soc. Servs., 223 Va. 225, 230, 288 S.E.2d 405, 407-08 (1982); Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990). On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory

requirements, and made its determination based on the child's best interests." <u>Farley</u>, 9 Va. App. at 329, 387 S.E.2d at 796. "[W]e will not disturb the trial judge's finding unless it is 'plainly wrong or without evidence to support it.'" <u>Richmond Dep't of Soc. Servs. v. Crawley</u>, 47 Va. App. 572, 580, 625 S.E.2d 670, 674 (2006) (quoting <u>M.G. v. Albemarle County Dep't of Soc. Servs.</u>, 41 Va. App. 170, 181, 583 S.E.2d 761, 766 (2003)).

The trial court's decision to terminate mother's parental rights was based upon Code § 16.1-283(B) and 16.1-283(C). Code § 16.1-283(B)(2) states as follows:

> The residual parental rights of a parent or parents of a child found by the court to be neglected or abused and placed in foster care as a result of (i) court commitment; (ii) an entrustment agreement entered into by the parent or parents; or (iii) other voluntary relinquishment by the parent or parents may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:
>
>     *      *      *      *      *      *      *
>
> It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time. In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.
>
> Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subdivision B 2 hereof:
>
> a. The parent or parents are suffering from a mental or emotional illness or mental deficiency of such severity that there is no reasonable expectation that such parent will be able to undertake responsibility for the care needed by the child in accordance with his age and stage of development . . . .

Based on the evidence presented, we cannot say the trial court's decision was "plainly wrong." Both J.S. and J.L. have significant special needs that require highly competent parenting skills, skills which mother simply does not possess. Mother's lack of parenting skills

was revealed not only by her psychological evaluation, but also through her impact on the children, both of whom suffered from a "trauma bond."  The boys' conditions improved briefly after their removal, but relapsed in response to unsupervised visitation with mother; visitation also resulted in a founded complaint of physical abuse.

Based upon such evidence, the trial court properly concluded that it was "not reasonably likely that the conditions which resulted in [the children's] . . . neglect or abuse [could] be substantially corrected or eliminated so as to allow [their] safe return to [mother] within a reasonable period of time,"[4] id., and that termination was in the children's best interests.

Accordingly, we affirm the trial court's decision.

Affirmed.

---

[4] As the evidence was sufficient to support the termination of mother's parental rights under Code § 16.1-283(B), we find it unnecessary to address the question of whether it was also sufficient under Code § 16.1-283(C).