COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Clements and Senior Judge Annunziata


ROMAN DOUGLAS

v.      Record No. 0546-08-4

ALEXANDRIA DEPARTMENT
  OF HUMAN SERVICES

MEMORANDUM OPINION*
PER CURIAM
AUGUST 26, 2008


FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
Donald M. Haddock, Judge

(Gwena Kay Tibbits, on brief), for appellant.  Appellant submitting
on brief.

(Jonathan Westreich; Ignacio Pessoa; Jill A. Schaub; Office of the
City Attorney, on brief), for appellee.  Appellee submitting on brief.

(Dale Warren Dover, on brief), Guardian *ad litem* for the minor
child.  Guardian *ad litem* submitting on brief.


Roman Douglas (hereinafter "mother") contends the trial court erred in terminating her

parental rights to her daughter, Y.B.[1]  For the reasons stated herein, we affirm the trial court's

decision.

Background

Y.B., born January 8, 2004, was removed from her mother's custody on November 29,

2006 following a determination she was abused or neglected.  The initial foster care service plan

approved in January 2007 provided for a goal of returning Y.B. home, with a concurrent goal of

relative placement.  Mother was directed to cooperate with mental health treatment, attend a

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Mother's parental rights were terminated on January 29, 2008, pursuant to Code
§ 16.1-283(B)(1)-(2) and 16.1-283(C)(1)-(2).

parenting class, obtain stable employment and housing, and stay in touch with the Alexandria Department of Human Services (hereinafter "ADHS").

Prior to Y.B.'s removal, she and her mother had lived in various shelters and had been asked to leave due to mother's failure to procure employment and noncompliance with shelter rules. Beginning in January 2006, Alexandria Child Protective Services ("CPS") had received a report alleging Y.B. was at risk for neglect due to a long history of homelessness with her mother. In March 2006, mother and daughter were living in the ALIVE shelter, the last local shelter available to them. At that time, mother was placed on probation and instructed to find employment and demonstrate her compliance with shelter rules. While mother resided in the shelter, she received family counseling from therapist Anika Van Brunt.

Van Brunt testified mother had difficulty controlling Y.B.'s "severe tantrum[s]." Y.B., then two years old, shook her head and spat. Mother responded by confining the child to the stroller or threatening to leave her. Van Brunt also tried to assist mother in weaning Y.B. from a baby bottle.

Counselor Nicole Ramirez attempted to help mother with her job search and money management so mother would not be evicted from the shelter. However, after meeting with mother on a weekly basis for two months, mother began missing her appointments. The service was discontinued in August 2006 due to mother's noncompliance.

On August 24, 2006, mother informed social worker Kathryn Kramer she was refusing further mental health treatment because she "did not believe she was crazy and did not need services." However, she did complete a psychological assessment by Dr. Eugene Stammeyer in September 2006. This assessment revealed mother was suffering from a delusional disorder and a dependant personality disorder. Dr. Stammeyer described these conditions as "difficult to treat."

On September 7, 2006, a preliminary protective order directed mother to cooperate with ADHS in its provision of services and to refrain from actions tending to endanger the child. Y.B. was removed in November 2006 when mother persisted in her refusal to engage in mental health treatment and was on the verge of losing her housing. Following the dispositional hearing, mother informed Kramer she was returning to Ethiopia and that ADHS could "give [Y.B.] to her father." Because mother indicated she was uncertain as to whether she would return to the United States, Kramer offered to arrange a "goodbye visit" with Y.B. Mother declined the offer.

Mother returned to the United States in January 2007, but continued to refuse mental health treatment. During visitation with Y.B., mother repeatedly questioned Y.B. about her treatment by her foster parents. Y.B. became so distressed during visitation she frequently screamed and ran around the room. Based upon the problems during visitation, ADHS required mother to sign a visitation contract. Mother refused to sign the agreement and had no further visitation with Y.B. after April 2007.

In late May 2007, mother was unemployed and continued to live in the ALIVE shelter. In August 2007, ADHS changed the goal to adoption, and on August 22, 2007, a petition was filed to terminate mother's parental rights. The juvenile and domestic relations district court granted the petition on October 25, 2007.

At the circuit court termination hearing in January 2008, mother testified she had a temporary job working for "Health and Human Resources" in Washington, D.C. She provided few details about her employment except to state it was a "long-term contract position" which she had held nearly three months. Mother admitted on cross-examination she had never held a job longer than two months since Y.B.'s birth.

Mother also acknowledged she had been evicted from her apartment for failure to pay rent when Y.B. was eighteen months old. Between May 2005 and January 2006 when mother

and Y.B. moved into the ALIVE shelter, they moved at least nine times and lived in approximately five different shelters. Mother admitted she moved out of the shelters because she was asked to leave. She also admitted she was asked to leave the ALIVE shelter after Y.B.'s removal. At the time of the termination hearing, mother had been renting a small room in a house for approximately three months. She shared the downstairs of the house with two couples and a man. Characterizing her housing situation as "technically shelter," mother admitted her credit was too poor to rent an apartment.

At the conclusion of her testimony, mother addressed the trial court directly over her own counsel's objection. Mother referred to the termination hearing as a "very top secret . . . hearing . . . and I don't know what the secret is." She asserted she was "harassed [] as if I am a witch, responsible for Iraq war, responsible for hurricanes, responsible for global warming." She denied having any mental problems and blamed her prior unemployment on social services.

Mother addressed the trial court a second time prior to the trial court's decision. Mother informed the trial court that Y.B.'s father, Yared Mengesha, and his sister, Mesrak Assefa, were "[s]ecret government agents" who did not want her to "blow out his identity, and my child has to sacrifice for that." She held Mengesha, Assefa, and "other government securities [sic]" responsible for her homelessness and Y.B.'s removal.

<u>Analysis</u>

I. Mother contends the trial court erred by admitting Dr. Stammeyer's testimony and by allowing her to address the court over her counsel's objection. Because neither issue was properly preserved for appeal, we decline to consider them.

- 4 -

A.  Dr. Stammeyer's Testimony

Mother sought to exclude Dr. Stammeyer's testimony at the termination hearing because Dr. Stammeyer had not responded to mother's subpoena of his records.[2]  The trial court overruled the objection because mother had been provided a copy of the report prepared by Dr. Stammeyer on October 18, 2006, and had failed to request a show cause order prior to the hearing to compel Dr. Stammeyer's compliance with the subpoena.

On appeal, mother raises a different argument, however.  She contends the testimony should have been excluded because its prejudicial effect outweighed its probative value.

"Pursuant to Rule 5A:18, absent good cause or to attain the ends of justice, we will not consider on appeal an argument that was not presented to the trial court, even if it involves constitutional claims."  Ashby v. Commonwealth, 33 Va. App. 540, 545, 535 S.E.2d 182, 185 (2000) (citation omitted).  A trial court must be alerted to the precise issue to which a party objects.  Neal v. Commonwealth, 15 Va. App. 416, 422-23, 425 S.E.2d 521, 525 (1992).  "The Court of Appeals will not consider an argument on appeal which was not presented to the trial court."  Ohree v. Commonwealth, 26 Va. App. 299, 308, 494 S.E.2d 484, 488 (1998).  See Rule 5A:18.  Accordingly, Rule 5A:18 bars our consideration of this question on appeal.

> Although Rule 5A:18 allows exceptions for good cause or to meet the ends of justice, appellant does not argue that we should invoke these exceptions.  See e.g., Redman v. Commonwealth, 25 Va. App. 215, 221, 487 S.E.2d 269, 272 (1997) ("In order to avail oneself of the exception, a defendant must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage might

---

[2] Mother's counsel argued extensively that she could not cross-examine Dr. Stammeyer effectively without the benefit of the subpoenaed records.  While mother's counsel noted it was "prejudicial" to her case to allow Dr. Stammeyer's testimony, she did not argue the testimony was inadmissible because its prejudicial effect exceeded its probative value.  Likewise, the written objection filed by mother's counsel prior to the hearing stated "Roman Douglas objects to any testimony of Dr. Eugene Stammeyer . . . unless her subpoena duces tecum . . . is complied with prior to trial, and in sufficient time for her counsel to prepare to cross-examine such witness[]."

have occurred." (emphasis added).  We will not consider, *sua sponte*, a "miscarriage of justice" argument under Rule 5A:18.

Edwards v. Commonwealth, 41 Va. App. 752, 761, 589 S.E.2d 444, 448 (2003) (*en banc*). Accordingly, we decline to consider mother's argument that the trial court erred in admitting Dr. Stammeyer's testimony.

### B.  Mother's Statements

Mother also argues the trial court erred by allowing her to address the court over her counsel's objection.  As with Dr. Stammeyer's testimony, mother argues for the first time on appeal her statements should have been excluded because their prejudicial effect exceeded their probative value.

At the termination hearing, mother asked the trial court's permission to make a statement to the court following her testimony.  Mother's counsel objected on the grounds that "there's no question before the witness."  When the trial court inquired of counsel if mother was acting against advice of counsel, mother's counsel responded, "That's correct, Your Honor.  I would like to offer to withdraw."  The trial court denied counsel's motion to withdraw.

Prior to the trial court's decision at the hearing, mother made a second statement.  While mother's counsel noted the statement was being made against counsel's advice, counsel did not object to the statement on any ground.

Mother does not assert the application of the "ends of justice" warrants our consideration of her argument.  Id.  Accordingly, we decline to consider this argument because it was not properly preserved for appeal.  Rule 5A:18.

II.  Mother argues further that the evidence was insufficient to support the trial court's decision to terminate her residual parental rights because it did not prove her failure to remedy the conditions which led to Y.B.'s placement in foster care.  We disagree.

When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests. See Toombs v. Lynchburg Div. Of Soc. Servs., 223 Va. 225, 230, 288 S.E.2d 405, 407-08 (1982); Farley v. Farley, 9 Va. App. 326, 329, 387 S.E.2d 794, 796 (1990). On review, "[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." Farley, 9 Va. App. at 329, 387 S.E.2d at 796.

> "The trial court's judgment, 'when based on evidence heard *ore tenus*, will not be disturbed on appeal unless plainly wrong or without evidence to support it.'" Fields v. Dinwiddie County Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005) (quoting Farley, 9 Va. App. at 329, 387 S.E.2d at 796). In its capacity as fact finder, therefore, the circuit court retains "broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley, 9 Va. App. at 328, 387 S.E.2d at 795.

Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 266, 616 S.E.2d 765, 769 (2005) (citations omitted). "[W]e will not disturb the trial judge's finding unless it is 'plainly wrong or without evidence to support it.'" Richmond Dep't of Soc. Servs. v. Crawley, 47 Va. App. 572, 580, 625 S.E.2d 670, 674 (2006) (quoting M.G. v. Albemarle County Dep't of Soc. Servs., 41 Va. App. 170, 181, 583 S.E.2d 761, 766 (2003)).

Here, the trial court based its termination decision on both subsection (B) and (C) of Code § 16.1-283. On appeal, mother notes that "DSS used Section 16.1-283(b) [sic] of the Code to request termination, saying that the conditions that led to foster care either have not been remedied or cannot be remedied within a reasonable period of time." Without referring specifically to either subsection, however, mother contends the evidence did not prove she failed to remedy substantially the conditions leading to Y.B.'s removal. Because we conclude the evidence supported termination under Code § 16.1-283(C)(2), we do not address whether

termination was warranted under subsection (C)(1) or subsection (B). See Fields v. Dinwiddie County Dep't of Soc. Servs., 46 Va. App. 1, 8, 614 S.E.2d 656, 659 (2005) (termination of parental rights upheld under one subsection of Code § 16.1-283 forecloses need to consider termination under alternative subsections).

Termination of parental rights to a child placed in foster care is warranted under Code § 16.1-283(C)(2) upon clear and convincing evidence that it is the child's best interests and that

> [t]he parent . . . without good cause, ha[s] been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court or any other plan jointly designed and agreed to by the parent or parents and a public or private social, medical, mental health or other rehabilitative agency shall constitute prima facie evidence of this condition. The court shall take into consideration the prior efforts of such agencies to rehabilitate the parent or parents prior to the placement of the child in foster care.

As mother does not question the trial court's finding that termination was in Y.B.'s best interests, we address only whether sufficient evidence was presented to establish mother failed without good cause to remedy the conditions which led to Y.B.'s placement.

Mother was directed to achieve several goals to secure Y.B.'s return home. The goals included cooperating with mental health treatment and obtaining stable employment and housing. Y.B. was removed from mother's care in November 2006 because mother, who had refused further mental health treatment and services aimed at assisting her with employment and housing, was on the verge of being evicted from the ALIVE Shelter. Mother told Kramer she

did not find treatment "useful" and noted "she [was] not going to speak in treatment." Following Y.B.'s removal, mother persisted in her refusal of mental health services.

Mother suggests she did not participate in mental health treatment because a mental health evaluation performed on February 3, 2006 by Lynn Fritz did not recommend further treatment and, by the time she was referred to Dr. Stammeyer, the decision to terminate her parental rights had already been made.

The record reveals, however, mother was asked to seek mental health treatment in late February 2006 because she was in danger of being evicted from the Carpenter Shelter following her failure to find a job and day care. After mother was evicted from the Carpenter Shelter and moved to the ALIVE Shelter in late March 2006, the director of the ALIVE Shelter, LaRue Barnes, placed her on probation during which she was to "demonstrate her attempts at finding a job and compliance with the rules." Barnes accepted mother on the condition ADHS provide "additional support."

Kramer testified, "[W]hen she was asked to leave the Carpenter[] Shelter and was going to the ALIVE house, it became more clear that there was a pattern of instability and we wanted to see if there was any way that mental health treatment could help Ms. Douglas maintain stability." In late May 2006, professionals from the Alexandria Mental Health Department met with ADHS and job counseling representatives to support mother's shelter placement. On August 24, 2006, however, mother informed Kramer she was

> no longer working with her Alexandria homebased worker, nor was she meeting her therapist at Mental Health for individual therapy. She agreed to meet with a psychologist on 8/25/06 for testing, but she stated that she was not going to participate if she did not feel it was necessary or helpful. She also stated in this meeting that she would not attend a parent support group that was mandatory for her continued stay at ALIVE shelter if she did not find it helpful to her. When asked where she would go if she was evicted from ALIVE, Ms. Douglas stated that she did not care and would leave the country with her daughter.

Mother, who had originally been scheduled for psychological testing in late July 2006, had already missed two appointments. On September 7, 2006, a preliminary protective order was entered which required mother to cooperate with ADHS in its provision of services and to refrain from actions tending to endanger Y.B.

Mother completed her psychological testing with Dr. Stammeyer in late September 2006. Despite Dr. Stammeyer's opinion she suffered from a delusional disorder and a dependent personality disorder, she continued to refuse treatment. When Y.B. was removed in November 2006, mother left the country and instructed ADHS to "give [Y.B.] to her father." Although she returned, she did not participate in mental health treatment and refused to comply with visitation rules during her visits with Y.B.

The foster care service plan approved in January 2007 required mother to cooperate with mental health treatment and obtain stable employment and housing. By the time of the termination hearing in January 2008, mother had had no visitation with Y.B. for approximately ten months, had lost her housing at the ALIVE Shelter, and had no permanent job. By her own description, she was living in housing that was "technically shelter."

"Virginia law recognizes the 'maxim that, sometimes, the most reliable way to gauge a person's future actions is to examine those of his past.'" Toms, 46 Va. App. at 267-68, 616 S.E.2d at 770 (quoting Petry v. Petry, 41 Va. App. 782, 793, 489 S.E.2d 458, 463 (2003)). Mother had a long history of homelessness and unemployment when Y.B. was removed. She admitted that, with the exception of the nearly three months she had held her current temporary position, she had never held a job more than two months since Y.B.'s birth. Despite her unstable living conditions and Dr. Stammeyer's evaluation indicating her need for mental health treatment, she refused to participate in treatment and was unable to secure permanent employment.

Accordingly, termination of mother's residual parental rights was supported by clear and convincing evidence that mother was unwilling or unable within a reasonable period of time to remedy substantially the conditions which led to Y.B.'s placement in foster care.

<u>Affirmed.</u>