COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Huff, Judges Russell and Malveaux
Argued at Richmond, Virginia

UNPUBLISHED

DANIELA STERNBERG

MEMORANDUM OPINION[*] BY
JUDGE WESLEY G. RUSSELL, JR.
MAY 8, 2018

v.        Record No. 1506-17-2

SPOTSYLVANIA COUNTY DEPARTMENT
 OF SOCIAL SERVICES

FROM THE CIRCUIT COURT OF SPOTSYLVANIA COUNTY
Ricardo Rigual, Judge

Valerie L'Herrou (Virginia Poverty Law Center, on briefs), for
appellant.

Robert F. Beard (Vanderpool, Frostick & Nishanian, P.C., on brief),
for appellee.

Daniela Sternberg (mother) appeals the circuit court's orders terminating her parental rights

to and approving a foster care plan with the goal of adoption of her son, D.S.[1]  For the reasons

below, we reverse the judgment of the circuit court and remand the case for further proceedings.

BACKGROUND[2]

Mother gave birth to her son, D.S., on August 5, 2009 in Grand Rapids, Michigan.  The

family moved to Spotsylvania County in 2014.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] The parental rights of D.S.'s father also were terminated in the proceedings below, but
father is not a party to this appeal.

[2] "On appeal, we view the evidence 'in the light most favorable to the prevailing party
below and its evidence is afforded all reasonable inferences fairly deducible therefrom.'"  Bristol
Dep't of Soc. Servs. v. Welch, 64 Va. App. 34, 40, 764 S.E.2d 284, 287 (2014) (quoting Logan v.
Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 462 (1991)).

Child Protective Services (CPS) became involved in October 2014 upon reports that mother had pinched D.S. and left a bruise. It also was reported to CPS that mother was not participating in any services to address ongoing mental health issues and a seizure disorder. Based on these reports and a history of dispositions regarding mother and D.S. from Michigan,[3] CPS asked mother to sign a safety plan. Mother complied, and on October 31, 2014, D.S. was placed in the care of the Thrashes, who were family friends.

Mother began receiving CPS ongoing services in December 2015. Although initially reluctant about receiving services, she became more receptive over time. Mother was asked to complete a mental health assessment, which she did. She was directed to attend outpatient counseling and did so. She further completed a VICAP assessment in December, but it had to be completed a second time. As a result, intensive in-home services for mother did not begin until early April 2015.

D.S. was not taken into foster care until late April 2015. At a family partnership meeting conducted on April 24, 2015, mother expressed her desire that D.S. no longer reside with the Thrashes because she had concerns about D.S.'s well-being. In response, the Department of Social Services (Department) expressed its concern for D.S.'s safety in mother's home in light of the allegations of past abuse and noted that she had not yet completed all the services recommended for her. The Department did not feel it was appropriate for D.S. to return to his mother at that point in time. Unable to find alternative relative placement, the Department took custody of D.S. the same

---

[3] No records from Michigan are part of the record before us. Rather, in the foster care plans prepared by the Department and admitted into evidence, the Department recited its interpretation of the events in Michigan. The Department describes incidents involving mother giving an infant D.S. a bottle at 9:00 a.m. and placing him down for a nap without checking on him again for 5 hours, mother slapping D.S.'s leg to the point that a handprint was visible, D.S. being burned with a curling iron while mother was attempting to curl his hair, and an incident where D.S. suffered a split lip.

day and filed with the juvenile and domestic relations district court (JDR court) a petition for emergency removal pursuant to Code § 16.1-251.

The petition was supported by an affidavit in which the Department alleged that D.S. was an "abused or neglected child" as defined by Code § 63.2-100. The Department relayed the history of alleged physical abuse of D.S. but did not allege any further incidents of physical abuse since the October 2014 pinching incident. By order dated April 27, 2015, the JDR court, referencing the allegations of abuse, granted the emergency removal, and D.S. remained in the custody of the Department.

The JDR court subsequently conducted a preliminary removal hearing on May 1, 2015. At that hearing, again citing the history of abuse, the JDR court awarded temporary custody of D.S. to the Department with visitation for mother to be determined by the Department. Because an objection was made to the JDR court's finding of abuse or neglect, an adjudicatory hearing was set to consider that issue. At the May 15, 2015 adjudicatory hearing, the JDR court found, by stipulation of the parties, that D.S. was an "abused or neglected child" because he was "without parental care or guardianship caused by the unreasonable absence or the mental or physical incapacity of the child's parent, guardian, legal custodian or other person standing *in loco parentis*." No findings regarding threat or fear of physical harm were made. Having made the abuse or neglect determination, the JDR court scheduled the case for a dispositional hearing. The Department was directed to file a foster care plan.[4]

The Department prepared its first foster care plan on May 26, 2015. It presented "Return to Own Home" or, alternatively, "Relative Placement" as the plan's goal. The report related how D.S.

---

[4] The records from the JDR court were admitted into evidence at the hearing before the circuit court.

came into the Department's care and noted mother's weekly visitation. The plan identified "as needs which must be met" the following:

> [Mother] must maintain safe and suitable housing for herself and the child. She will also need to obtain and maintain employment and demonstrate that she is able to care for D.S. emotionally, physically, financially, etc. Ms. Sternberg will need to comply with all the services offered in the initial Foster Care Service Plan . . . . She will need to demonstrate that she is capable of making healthy decisions for herself and the child and can effectively parent and care for [D.S.]. She will need to continue to attend weekly visitation with [him], and continue to be appropriate and support his placement in foster care.

The plan also required mother to provide all pertinent information regarding D.S.'s history and care, to include a list of blood relatives and contact information; to sign a release of information; to maintain regular contact with the Department on at least a bi-weekly basis; to keep employment, housing, and emergency contact information current, reporting any changes within 72 hours of the event; to comply with all court-ordered services; and to participate in a psychological/substance abuse evaluation and a parental capacity evaluation, and follow all resulting recommendations. Per the plan, mother also was expected to pay any assessed child support; to demonstrate a lifestyle free of negative influences, including but not limited to, substance abuse and domestic violence and submission to random drug screens; to maintain regular positive contact with the child, as evidenced by 80% attendance with scheduled visitations; to cooperate with the Department's Family Educator Program if deemed appropriate; to participate in all family partnership meetings and comply with all resulting recommendations; and to complete a parenting class approved by the Department and demonstrate her ability to effectively parent the child.

By order dated June 26, 2015, the JDR court approved the plan, identifying return home as the plan's goal after it found that D.S. had "been the subject of physical abuse and neglect" and that mother had "failed to comply with the Safety Plan[.]" In its order, the court noted mother's

"lengthy history of intervention with D.S.S in V[irginia] and Mich[igan]." The foster care plan was revised to require expressly mother to "[d]emonstrate the ability to maintain stable housing and financial means to support [D.S.]."

Per the approved plan, in July 2015, mother submitted to and completed a parental capacity evaluation with Dr. A.J. Anderson, a clinical psychologist. He performed personality, intelligence, and parenting tests. He did not examine D.S. or monitor any interactions between mother and child. Dr. Anderson reported that mother's IQ was within normal range, but she possessed low verbal comprehension. He noted that while mother was cooperative and responsive, she "did not demonstrate a lot of insight concerning herself and her situation." He noted that she was defensive and lacked confidence. Dr. Anderson described mother's performance on the Parent Awareness Skill Survey, which relies on a series of hypothetical parenting situations, as "fair but spotty." With respect to the Child Abuse Potential Inventory, mother tested in the normal range, but Dr. Anderson determined the result could not "be taken at face value." Dr. Anderson noted additional information could alter his conclusions.

Based on his observations, Dr. Anderson recommended psychiatric supervision for mother's medication needs; mental health treatment to address issues related to mood, self-esteem, dependency, stress, and coping, as well as depression; and education and training to improve understanding of child development issues and behavior management techniques. With respect to parental training, Dr. Anderson noted that a more hands-on approach likely would be more effective in light of mother's cognitive abilities.

In September 2015, the Department prepared a plan review report. Mother was attending weekly visitations with D.S. and maintaining contact with the Department. She had signed the required releases. Mother was working with the family educator assigned by the Department and her mental health support worker from Campus Counseling. Some changes in housing and

employment were noted as well as mother's efforts in receiving outpatient counseling services. Continued foster care placement was recommended to allow for "time to complete any remaining recommended services . . . [and] to prepare emotionally and financially for the child's return . . . ." By order dated October 16, 2015, the JDR court reapproved the plan with increased visitation and set the matter for a permanency hearing.

Also in October, based on a referral from the Department, mother began receiving services from Family Solutions, a private agency providing community-based services for at-risk youth, substance abuse and health issues, and social services cases. Mother's service plan was crafted based on Dr. Anderson's evaluation, and she was referred to the agency's Family Reunification Service Program, where she was to receive intensive, hands-on parent training to address child development and behavior management techniques. This included parental education and therapeutic visitation whereby mother had supervised visitations with D.S. that were bookended with consultations with a social worker. As treatment goals, the agency sought to increase parental education and improve parental judgment, to improve parenting performance, and to ensure a team approach to reunification. The agency identified as potential barriers to reunification residential and financial stability, not putting the child's needs first, and general safety issues. In December 2015, mother was released from the Department's Family Educator Program to focus on her work with Family Solutions.

The JDR court conducted a permanency planning hearing on March 18, 2016. The Department submitted a plan dated February 4, 2016, with return home/adoption as concurrent goals. The plan noted that mother had maintained contact with the Department, including improved compliance with its 72-hour rule, and that she was living without negative influences. The Department further reported that mother successfully had completed the Family Educator Program and continued to comply with the recommendations made by Dr. Anderson. Finding it to be

achievable, the court approved a permanent goal of return home. A six-month interim plan was adopted, and a follow-up hearing was ordered.

Also in March 2016, Family Solutions changed mother's program goals. The agency discontinued further parental education and focused on visitation. The goals were changed to becoming an effective authority figure for her son, meeting her son's basic needs, and increasing her financial stability.

In May 2016, per the foster care plan and Dr. Anderson's recommendation, mother attended an outpatient management appointment. Contrary to Dr. Anderson's initial thoughts, the provider recommended by the Department concluded that mother did not need psychotropic medications.

In August 2016, the Department prepared a service plan in which the Department expressed its support for "an achieved goal of Return Home based on [mother's] marked progress" and requested that "during the September 16, 2016 hearing [D.S.] be returned to [mother's] custody." In support of its request, the Department reported that mother "has demonstrated a life free of negative influences and has shown the ability to maintain stable and suitable housing and employment[.]" In addition to noting that mother had attended and completed outpatient counseling services, the August 2016 report enumerated sixteen areas of responsibility for mother as part of the return home plan, including payment of child support, maintaining contact with the Department and D.S., and compliance with program recommendations; the Department reported that all had been successfully completed.

Nevertheless, in September 2016, employees of Family Solutions started to doubt the viability of reunification. Family Solutions was concerned about mother's judgment regarding her relationship with her pastor, who had an unknown criminal charge against him, and her ability to put D.S.'s needs first. At a second permanency review hearing in September, the JDR court maintained return home as the outlined goal but continued the matter until December. The JDR

court also directed parent education to resume, and Family Solutions began providing training on issues of parental judgment.

Family Solutions prepared a progress report for the period November 1 to December 2, 2016. It noted that mother had attended 86% of scheduled visitations and 75% of parenting sessions. The visitations were unsupervised. The report expressed continued concerns about budgeting, lack of insight, and issues related to the pastor. The agency reported:

> [Mother] has made it clear she enjoys her son [D.S.] and wants him to return to her care . . . . She loves her son. She has overcome significant obstacles throughout her entire lifespan due to her strength, determination and ability to advocate for herself. With respect to the foster care plan[,] she has made progress in the areas of housing, employment and demonstrating a greater awareness of potential safety issues . . . as well as planning nutritious meals. This progress led to visits being expanded to include . . . visitation to the community and home including recent overnight visits.
>
> Inappropriate parental judgment and poor parental decision making remain the crux of this case. . . . [A] clear pattern exists that demonstrates an inability to put [D.S.]'s needs first on a consistent basis.

A family partnership meeting was held December 13. In light of the report from Family Solutions, the Department elected to withdraw the foster care plan with its goal of return home. On December 26, 2016, the JDR court consequently disapproved that plan and directed the Department to submit a new permanency plan for consideration.

On January 12, 2017, the Department filed a new petition identifying adoption as the permanent placement goal. The Department petitioned to terminate the parents' residual parental rights pursuant to Code §§ 16.1-283 and 16.1-241(A)(5). The Department alleged that a foster care plan including termination and adoption was in the best interest of D.S. After a hearing, by orders dated April 12, 2017, the JDR court granted the Department's petitions based on finding that the requirements of Code § 16.1-283(C) had been met. Mother appealed to the circuit court for a trial *de novo*.

The circuit court conducted its evidentiary hearing two months later on June 13, 2017, at which point D.S. had been in foster care for over two years.

The Department introduced into evidence the JDR court file, Dr. Anderson's July 30, 2015 report, and the Family Solutions December 2016 report. Representatives from the Department and Family Solutions testified. Mother testified on her behalf and introduced into evidence an exhibit depicting the numbers of children in the custody of foster care.[5]

Katie Padgett, a family services specialist and foster care worker with the Department, testified to the foster care plan she had prepared for mother. Per the plan, as noted above, mother was to pay child support, provide and sign a release for all information to the Department, cooperate fully with the Department, demonstrate a lifestyle free of negative influences, demonstrate the ability to obtain and maintain stable and suitable housing and employment. Padgett testified that, but for some employment issues, mother had complied fully with those requirements. She had obtained housing, maintained regular contact with the Department, and generally kept Padgett updated regarding her status. Padgett testified that mother had complied with all court orders.

---

[5] A guardian *ad litem* was appointed to represent D.S.'s interests; however, the guardian did not appear at the hearing in circuit court. Rather, after reaching her conclusions regarding the case without the benefit of the evidence at the hearing, the guardian had another person appear at the hearing in her stead. From the record, there does not appear to be any formal relationship, such as being members of the same law firm, between the appointed guardian and the person who appeared at the hearing.

The person who appeared at the hearing stated that she had spoken with the appointed guardian, who had "let me know what her recommendation is and walked me through what this case was . . . , so I'm prepared to present her recommendation and opinion to the [c]ourt based on her involvement." She noted that she was *not* prepared to serve as an appointed guardian in the case because she had not "had that full role throughout the proceeding." At the conclusion of the evidence the "substitute" did not offer her own opinion, but rather, offered what she believed would have been the position of the appointed guardian "based on th[e new] information that was heard today." Accordingly, no guardian, whether appointed or serving as a substitute, offered an opinion that was formed based on all of the evidence. Thus, D.S. was denied a fully informed guardian to represent his interests, and the circuit court, in reaching its decision, was denied the benefit of a validly formed opinion of a guardian *ad litem*.

In cross-examining Padgett, mother inquired regarding the circumstances leading to D.S. being taken into the Department's custody, which drew an objection from the Department. The trial court sustained the objection and limited mother's ability to adduce evidence regarding how D.S. had come into custody of the Department. In the back and forth over the line of questioning, the Department argued that the "reason the child came into foster care according to the record is that the child was abused or neglected."

Eventually, Padgett testified that CPS got involved in October 2014 when it was reported that mother had pinched D.S. and left a bruise and was not receiving needed treatment for mental health issues, which resulted in a voluntary placement with another family. Mother then specifically asked Padgett, "Was it your understanding that the reason why [the Department] decided . . . to bring [D.S.] into foster care was because [mother] no longer felt that the Thrash home was a safe home for him and [the Department] didn't feel comfortable returning him to her at that point?" Padgett responded that, based on this development as expressed at the family partnership meeting in April 2015, with no relatives available to take custody of D.S., "the Department had no other viable option at that point than to place [the child] in the Department's custody because we at that time did not feel as though it was appropriate for [him] to return to [mother]." The questioning then turned to how and which goals were designed for mother beginning April 2015.

With respect to the goals of becoming an effective authority figure, making efforts to provide for the financial needs and long-term care of D.S., and taking care of his basic needs, Padgett indicated that, during the course of her involvement, she had not observed mother fail to meet her son's needs and agreed that mother had continued to make efforts to provide for long-term care and financial needs. Padgett recalled no negative observations from when she supervised visitation and admitted that D.S. had never been injured due to lack of care and that he was more or less responsive to mother's instructions.

Anne Henley, the director of Family Solutions, also testified. She explained how the agency fashioned the services offered mother. Henley noted that, "when we did the initial assessment there were a lot of issues that needed to be resolved, but there was a real willingness there on the part of [mother]. We all really wanted [D.S.] to go home and we got awful close." She described the progression of increased visitations, stating "although there had been some incidents with safety over the summer, there also had been many visits where [mother] had been able to demonstrate some progress in those areas" so overnight visitation was contemplated in September 2016.[6] Henley supervised two visits and stated that they "really went relatively well," but further observed that mother had failed to complete certain tasks that were to be performed outside of sessions.

With respect to the change of goals in March 2016, Henley explained, "we were making progress on some of th[e initial] goals and making no progress on other[s]; [s]o . . . we stopped the parent education and one-on-one . . . and we focused on only the most three critical behaviors that we thought we needed to observe . . . ." She continued, "We transitioned the goals because we were experiencing a lot of defensiveness and argumentativeness." Henley acknowledged that staff progress reports indicated that mother routinely was meeting the goals. Henley further testified, however, to reports of incidents of safety concerns and general dysregulated behavior during some visitations. Henley agreed that there was bonding and attachment between mother and D.S. and that mother had demonstrated improvement in safety awareness. Regarding her concern about the pastor, Henley testified that the concern was less about the actual charges against the pastor and more about mother's response to the information and the potential for mother exposing D.S. to a

_____

[6] We note that the "incidents with safety" were not situations involving any type of physical or emotional abuse or even corporal punishment. Rather, they involved circumstances such as D.S. continuing to run at a pool after his mother had instructed him to stop doing so and crossing a Wal-Mart parking lot in a manner deemed unsafe.

bad environment or harm; Henley conceded she had no knowledge of D.S. ever being alone with the pastor. Ultimately, Henley believed reunification was no longer possible because of "issues of parental judgment and accountability that would surface throughout the case despite the training and education that was provided . . . those issues were the biggest of concern." She acknowledged mother had made progress, but "she just was not able to cross the finish line."

Rebecca Darling performed the initial intake upon mother's referral to Family Solutions and worked with mother regarding family reunification, parental education, and supervised visitations until the end of January 2016. She relayed that mother was homeless when she started with Family Solutions. Darling described several incidents during visitations she supervised that gave her concern, particularly with respect to mother's ability to accept responsibility and to serve as an authority figure rather than a buddy to her son. Darling testified that at the end of January, Family Solutions decided to end its provision of parenting skills to mother, but to "proceed with the visitations because we did not feel like we were getting anywhere with the nurturing skills or the parenting."

Callie Dunn, a family reunification specialist at Family Solutions also worked with mother and provided supervised visitations. She testified to episodes of "dysregulation" and some safety concerns during visitations. Dunn also testified that she found mother to be generally compliant from April to December 2016 and that safety issues improved upon discussing any concerns. She further agreed that despite mother's defensiveness, mother took in information and applied it to real life situations. Dunn reported that she witnessed no corporal punishment or threat of violence. To the contrary, she considered mother to be too permissive with D.S. and expressed concern over continued inconsistency with follow-through with discipline.

Heather Blake, another family reunification specialist, began working on mother's case in September 2016 to focus on training on judgment and decision making, as well as some problem solving. She provided her services for two months. She relayed her concerns regarding mother's ability to meet her son's emotional needs or to take ownership as to the conditions bringing him into care, her lack of employment and financial stability as well as basic financial literacy, and her judgment in choosing appropriate caregivers. Based on her involvement, Blake concluded that D.S. "needed permanency and at that point we just didn't feel that mom would be able to provide that for him."

Mother testified on her own behalf. She explained that she had been working at Subway from April 3 till June 1 2017, where she earned $7.25 per hour. Prior to leaving that job, she became employed at BJ's restaurant, where, at the time of the hearing, she continued to work four to six days a week, earning $10 per hour plus tips. She relayed that she lived in a Section 8 townhouse where a fully furnished room was available to D.S.; she is able to walk to work and her use of the home is not contingent upon her having custody of her son. She testified that she would have daycare available through a friend who had undergone a background check.

Mother further relayed that since the April 2016 termination hearing in the JDR court, she had stopped receiving services from Family Solutions, but on her own accord received additional counseling and took another parenting class. Mother described the class as "great" and averred that she had gained a new understanding of what can constitute child abuse. She testified: "Child abuse comes in many forms. Physically, mentally, emotionally . . . showing lack of support . . . is considered neglect. So I don't want to do that to [D.S.] anymore, and I'm sorry that I haven't always been there." She stated she was willing to participate in any further services deemed necessary. Mother expressed that she felt hurt and sad because she had not seen D.S. since the JDR court termination hearing and that she missed him; she articulated, "It's really hard not knowing if

he's okay or how he is. It's kind of like a dark cloud. It's just empty." Mother made clear that she was willing to remain under Department supervision if she gained custody of D.S.

The circuit court granted the Department's petitions regarding the foster care plan and termination of mother's parental rights. From the bench, the circuit court explained its reasoning for terminating mother's parental rights. The court noted the incidents about which the social workers had expressed concern, but ultimately did not give them much weight. Specifically, the court stated that it had heard

> a lot of detail about different situations that have gone on . . . which obviously are important to go through. But . . . it's really not about whether you learn to help your kids cross the street safely, or whether they're running and horse-playing at a pool, or whether he's falling into a shopping cart or gets burned by a TV dinner or has a car seat or is wearing a helmet when he's on a scooter.

After referencing the provisions of Code § 16.1-283(C), the court continued: "[T]he first question for the [c]ourt is what are the conditions that led to [D.S.'s] continued placement in foster care. Physical abuse. That's why we're here." The court explained,

> It's not about balancing your checkbook or having stable housing or whether you're poor or homeless. A lot of people are poor or homeless and have their children and take good care of them. . . . And it's not about checking the boxes on the foster care plan: I did this, I did this . . . . It's about substantially remedying the condition that led to the foster care, and that's physical abuse.

The court concluded that mother failed to substantially remedy that condition in the time since D.S. was placed in foster care. The court found that "the overwhelming evidence is that [mother] never so much as took any responsibility or had any insight as to the physical abuse that [she] had inflicted upon [D.S.] and what [she was] doing to remedy that . . . . It was so overwhelming that that wasn't there." With respect to the services offered mother, the court found them reasonable, noting that they consisted of "hours and hours"; however, the court also stated that it did not "hear a lot about the treatment for that particular purpose, but overall all these things . . .

- 14 -

the counseling and parenting are designed to remedy that situation." In rendering its judgment, the circuit court stressed, "The most important situation is the abuse of [D.S.]"

In approving the new foster care plan with a goal of adoption, the circuit court, upon inquiry, indicated that it also had addressed the best interests prong of the termination statute when it addressed the foster care plan, adding "the opinions of all the experts and all the witnesses that have testified for the Department overwhelmingly and by clear and convincing evidence illustrate it's in the best interests to change the plan to adoption and also to terminate the parental rights."

In accordance with its ruling from the bench, the circuit court on August 25, 2017, entered an order terminating mother's residual parental rights to D.S., explicitly finding pursuant to Code § 16.1-283(C), that she "without good cause, has been unwilling or unable within a reasonable period of time not to exceed twelve months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or rehabilitative agencies to such end." The circuit court also entered an order approving adoption as the permanent goal. This appeal followed.

On appeal, mother challenges the sufficiency of evidence.[7] She first claims that

> The court erred as a matter of law in finding the evidence sufficient to prove that it was in the best interests of D.S. to approve the foster care plan of adoption and terminate [mother's] parental rights when the evidence showed that [she] had substantially remedied the issues that brought D.S. into care; that the Department had no further concerns regarding ongoing abuse; that D.S. had a bond with his mother; and that the statistical likelihood of adoption being a likely permanency outcome D.S. was low. Further, the main reasons the Department changed its goals from reunion to adoption were related to financial stability and parental judgment, and the court explicitly stated there were not the basis for its ruling.

---

[7] Mother also argues that the circuit court erred in limiting evidence on the reason for D.S. entering foster care. Our resolution of mother's argument regarding the sufficiency of the evidence argument makes it unnecessary for us to reach this question.

Mother further contends the circuit court erred

> when it disregarded the substantial progress [she] made in
> remedying the conditions that brought D.S. into foster care, when
> it found the progress had not been made in a reasonable time
> because some of that progress took place outside the 12-month
> timeline.

ANALYSIS

It is hard to overstate the significance of a court's decision to terminate parental rights. Such a decision breaks the most natural of bonds, rendering the "parent . . . a legal stranger to the child." Najera v. Chesapeake Div. of Soc. Servs., 48 Va. App. 237, 240, 629 S.E.2d 721, 722 (2006) (internal quotation marks and citations omitted).

This natural bond also has a constitutional significance. "'[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by' the United States Supreme Court." Geouge v. Traylor, 68 Va. App. 343, 368, 808 S.E.2d 541, 553 (2017) (alterations in original) (quoting Troxel v. Granville, 530 U.S. 57, 65 (2000) (plurality opinion)). That liberty interest "does not evaporate simply because they have not been model parents or have lost temporary custody . . . to the State." Richmond Dep't of Soc. Servs. v. Crawley, 47 Va. App. 572, 581, 625 S.E.2d 670, 674 (2006) (alteration in original) (quoting Santosky v. Kramer, 455 U.S. 745, 753 (1982)). Because "parents retain a vital interest in preventing the irretrievable destruction of their family life[,]" Santosky, 455 U.S. at 753, the state cannot "infringe on the fundamental right of parents . . . simply because a state judge believes a better decision could be made," Copeland v. Todd, 282 Va. 183, 199, 715 S.E.2d 11, 19-20 (2011) (quoting Troxel, 530 U.S. at 72-73). Rather, "the law presumes that the child's best interests will be served when in the custody of its parent[,]" Judd v. Van Horn, 195 Va. 988, 996, 81 S.E.2d 432, 436 (1954); and where "there is 'reason to believe that positive, nurturing parent-child relationships exist, the [state's] *parens patriae* interest favors preservation, not severance, of natural familial

bonds,'" Crawley, 47 Va. App. at 581, 625 S.E.2d at 674 (alteration in original) (quoting Santosky, 455 U.S. at 766-67).

To protect these natural and constitutional interests, the General Assembly has established statutory requirements that allow for termination of parental rights when it is in the best interests of the child *and* the state has established a significant failure on the part of the parent. See, e.g., Code § 16.1-283. In the absence of such a parental failure, a court may not terminate parental rights. Copeland, 282 Va. at 199, 715 S.E.2d at 20 ("[T]he Constitution requires more than a showing of the best interests of the child to terminate parental rights.").

In cases involving the termination of parental rights "this Court presumes that the [circuit] court 'thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Eaton v. Wash. Cty. Dep't of Soc. Servs., 66 Va. App. 317, 324, 785 S.E.2d 231, 235 (2016) (quoting Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 7, 614 S.E.2d 656, 659 (2005)). We defer to the circuit court's factual findings, and will only disturb its judgment if that judgment is "plainly wrong or without evidence to support it." Fields, 46 Va. App. at 7, 614 S.E.2d at 659 (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)). We note, however, that "[c]onclusions unsupported by facts are insufficient to sever for all time the legal connection between parent and child." C.S. v. Va. Beach Dep't of Soc. Servs., 41 Va. App. 557, 566, 586 S.E.2d 884, 888 (2003) (quoting Ward v. Faw, 219 Va. 1120, 1125, 253 S.E.2d 658, 662 (1979)).

Here, the circuit court terminated mother's rights pursuant to Code § 16.1-283(C)(2), which provides that

> [t]he residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment, an entrustment agreement entered into by the parent or parents or other voluntary relinquishment by the parent or parents may be terminated if the

court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that . . .

> [t]he parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court . . . shall constitute *prima facie* evidence of this condition. The court shall take into consideration the prior efforts of such agencies to rehabilitate the parent or parents prior to the placement of the child in foster care.

In terminating mother's parental rights, the circuit court found that "physical abuse" was the condition that caused D.S. to be placed in foster care.[8] Although we note that D.S. was placed in foster care only after mother requested that D.S. no longer reside with the Thrashes, there was evidence to support such a finding, and therefore, it is binding upon us. Accordingly, the question before us is whether there was evidence below sufficient to establish that, without good cause, mother was "unwilling or unable . . . to remedy substantially th[at] condition[]." Code § 16.1-283(C)(2).[9] The record was devoid of such evidence, and, in oral argument in this Court,

---

[8] Although in the proceedings below the circuit court focused on potential abuse, it is important to recognize that the circuit court did not terminate mother's parental rights pursuant to Code § 16.1-283(B). As a result, the circuit court did not find that any "neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development," Code § 16.1-283(B)(1), or that it was "not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time," Code § 16.1-283(B)(2).

[9] In reviewing a parent's alleged inability or unwillingness to remedy such a condition, courts must consider the parent's use of the reasonable and appropriate services that a department of social services is required to provide. Code § 16.1-283(C)(2). See also Weaver v. Roanoke Dep't of Human Res., 220 Va. 921, 928-29, 265 S.E.2d 692, 697 (1980) (recognizing that, before a court may terminate parental rights, the statute requires a social services

the Department effectively conceded this point. There was no evidence of any abusive acts, whether physical or otherwise, after the child's placement in foster care. In fact, testimony from a witness called by the Department established that she had observed no corporal punishment, use of force or threats of force during mother's visits with D.S. Furthermore, as the Department conceded in oral argument in this Court, the only services mother was provided that focused on preventing abuse in the future were the mental health counseling services, and the uncontradicted evidence established that mother successfully completed all counseling services, participating in the sessions with providers recommended by the Department until she was released by those counselors. Accordingly, the evidence is insufficient to establish that mother failed to remedy the condition leading to D.S.'s placement in foster care notwithstanding the services provided by the Department.

The Department's failure to adduce evidence regarding potential abuse is likely explained by two factors. First, it seems logical to conclude that, if the Department possessed such evidence, it would have sought to introduce it. Second, the Department was not proceeding under an abuse theory. Rather, as it confirmed at oral argument in this Court, it was the Department's position that mother's parenting skills had not progressed to the point where it was appropriate to return the child to her care and custody.[10] Accordingly, the evidence adduced by the Department focused on parenting skills and not abuse.

---

department to offer a parent reasonable and appropriate services to address the condition that led to placement of the child in the care of others).

[10] It was and remains the Department's position that, although D.S. may have entered foster care as a result of a finding of abuse, the "continuation of [his] foster care placement" as specified in Code § 16.1-283(C)(2) was tied to mother's failure to demonstrate sufficient parenting skills unrelated to the initial abuse allegation. We note that the circuit court made no such finding. Additionally, in making its ruling, the circuit court in essence dismisses any reliance on mother's financial situation, minor incidences of safety concerns, or any other factor that would fall within the ambit of the Department's "parenting skills" argument.

Given the reality of the case it presented below, the Department asks this Court to affirm the termination of mother's parental rights by utilizing the "right result, wrong reason" doctrine. Specifically, the Department argues that we should find that its evidence regarding parenting skills provided a sufficient basis for the circuit court's termination decision.

"Under the right result for the wrong reason doctrine, it is the settled rule that how[ever] erroneous . . . may be the reasons of the court for its judgment upon the face of the judgment itself, if the judgment be right, it will not be disturbed on account of the reasons." Perry v. Commonwealth, 280 Va. 572, 579, 701 S.E.2d 431, 435 (2010) (alteration in original) (internal quotation marks and citations omitted). However, the doctrine assumes that the record supports the alternative basis for affirmance, meaning that any facts necessary to support that basis have been found, whether by an express finding of the factfinder, the lack of any contrary evidence, or as a result of a stipulation of the parties. As the Supreme Court has explained,

> [t]he record supports an alternative ground when it reflects that all evidence necessary to that ground was before the circuit court. And if that evidence was conflicting, then the record must show how the circuit court resolved the dispute -- for example, it must demonstrate how contradicting testimony was weighed or credited.

Banks v. Commonwealth, 280 Va. 612, 617, 701 S.E.2d 437, 440 (2010).

Here, even if we were to assume that the evidence was sufficient to terminate parental rights based on the Department's "parenting skills" theory, it is clear that the evidence on this point was contested and in conflict. In addition to mother's testimony regarding her efforts and improvements, the Department's own evidence was in conflict. After all, in the Department's August 2016 service plan, which was admitted into evidence, the Department had requested that D.S. "be returned to [mother's] custody" and noted "an achieved goal of Return Home based on [mother's] marked progress." In support of this request, the Department reported that mother "has demonstrated a life free of negative influences and has shown the ability to maintain stable and

- 20 -

suitable housing and employment[.]" The August 2016 report enumerated sixteen areas of responsibility for mother as part of the return home plan, including payment of child support, maintaining contact with the Department and D.S., and other items associated with demonstrating parenting skills; the Department reported that all had been successfully completed.

Furthermore, as the Department conceded in this Court, the circuit court made no findings of fact regarding mother's parenting skills or how it weighed the evidence adduced regarding those skills. The circuit court referenced these issues only to emphasize that the Department's concerns in this regard did not inform the court's ultimate decision. As a result, the record does not support affirmance on the alternative ground advanced by the Department.

Given that the evidence was insufficient to support the circuit court's termination decision pursuant to Code § 16.1-283(C)(2), we reverse the decision of the circuit court and vacate both its order terminating mother's parental rights to D.S. and its order approving the change in goal for the foster care plan from "return home" to "adoption."[11] Accordingly, we remand the case to the circuit court for further proceedings consistent with this opinion.

---

[11] We recognize that the less demanding preponderance of the evidence standard applies to our review of the circuit court's decision regarding the foster care plan. Najera, 48 Va. App. at 240, 629 S.E.2d at 722 ("A preponderance-of-the-evidence standard governs judicial review of the foster care plan recommendations, while the more stringent clear-and-convincing-evidence standard applies to the ultimate termination decision."). In this case, the evidence was insufficient to meet either evidentiary standard.

CONCLUSION

For the reasons stated above, we reverse the judgment of the circuit court, vacate the orders terminating mother's parental rights to D.S. and approving the change in goal for the foster care plan, and remand the case to the circuit court for further proceedings consistent with this opinion.[12]

Reversed, vacated, and remanded.

---

[12] On multiple occasions, we have observed that "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 322, 746 S.E.2d 509, 522 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990)). This observation applies to the time it takes a parent to address the issues that necessitated a disruption of the normal parent-child relationship. The time a parent is apart from a child while successfully pursuing an appeal of the termination of that parent's rights regarding the child is different in kind. Accordingly, in any proceeding on remand, the fact that mother has been separated from D.S. since the JDR court terminated her parental rights shall not be used to justify any diminution in mother's parental rights.