COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, O'Brien and Senior Judge Haley

UNPUBLISHED

MEGHAN JOHNSON

v.     Record No. 1616-18-4

LOUDOUN COUNTY DEPARTMENT
OF FAMILY SERVICES

MEMORANDUM OPINION[*] BY
JUDGE MARY GRACE O'BRIEN
MAY 21, 2019

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Jeanette A. Irby, Judge

(Heather S. Miller; Thomas S. Rock, Guardian *ad litem* for the minor
children; Sevila, Saunders, Huddleston & White, P.C., on brief), for
appellant. Appellant and Guardian *ad litem* submitting on brief.

(Leslie Barnes, Assistant County Attorney; Loudoun County
Attorney's Office, on brief), for appellee. Appellee submitting on
brief.

Meghan Johnson ("mother") appeals an order terminating her residual parental rights to her

three children and approving a permanency plan with a goal of adoption. Mother argues that the

court's exclusion of testimony at trial from her therapist, Thomas Lester, violated the terms of its

pre-trial "Order for Telephone Testimony." She also contests the sufficiency of the evidence to

terminate her parental rights under Code § 16.1-283(B) and (C) and to approve the permanency

planning goal of adoption under Code § 16.1-282.1. For the following reasons, we find that the

court did not err and affirm its decision.

BACKGROUND

Mother and William Ramey ("father") are the parents of three children, C.J. (born March 7,

2011), A.J. (born September 1, 2013), and K.J. (born June 18, 2014). In April 2016, mother

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

contacted Loudoun County Department of Family Services ("DFS") because the family was homeless. A DFS caseworker, Debbie Bennett, placed the children in temporary care for three weeks and assisted mother with obtaining an apartment, paying the first month's rent, and finding childcare.

A Leesburg police officer visited the apartment on July 9, 2016, and he noted that the children's bedroom had no furniture and one child was sleeping on the floor. While in the apartment, the officer also seized drug paraphernalia used to smoke cocaine.

On July 12, 2016, another DFS caseworker created a safety plan requiring mother to obtain a substance abuse evaluation, eliminate the presence and use of drugs around the children, and dispose of cigarette butts and beer cans strewn on the apartment floor. Mother also agreed not to allow father in the home or leave him unsupervised with the children due to his substance abuse. However, father was at the home when Bennett visited on August 3, 2016. At that time, mother also told Bennett that she suspected A.J. had been sexually abused by someone renting a room within the apartment.

The family was evicted in August 2016, and DFS arranged another three-week placement for the children. Mother and father moved to North Carolina where they planned to establish a home for themselves and the children. However, the parents did not return by the end of the placement, and on August 30, 2016, the Loudoun County Juvenile and Domestic Relations District Court ("JDR court") entered an emergency removal order placing the children in foster care. When mother eventually returned to Virginia, Lauren Blitz, a DFS foster care worker, provided her with referrals for a parental capacity evaluation, a substance abuse evaluation, an intensive outpatient substance abuse program, and parent-mentoring services. DFS identified the following areas of concern before the children could be returned to her: substance abuse, domestic violence by father against mother, homelessness, providing appropriate supervision and attention to the children,

employment issues, proper money management, maintaining safe relationships, and maintaining a safe and clean environment where the children's needs could be met.

Dr. William Ling, a clinical psychologist, evaluated mother's parental capacity on January 16, 2017. His report was based solely on information provided by the parents. Although Dr. Ling concluded that mother was "reasonably appropriate" in her "knowledge and . . . report of her relationship with her children," and "data suggest[ed] no questions regarding her capacities to parent," he noted that the family had pragmatic issues, including mother's employment abilities and a need for couple's therapy between the parents. Mother did not disclose to Dr. Ling her cocaine and alcohol use or father's abusive behavior toward her. She also indicated that she did not believe the children were having any issues and were not neglected, despite their housing instability and exposure to domestic violence and drug use.

In February 2017, a substance abuse services supervisor from the Northwestern Community Services Board ("Northwestern") conducted a substance abuse evaluation of mother and recommended that she complete an outpatient program. Mother attended the first meeting of a fourteen-week outpatient program on February 14, 2017, but she did not return for any other meetings during that session. She began another session on May 23, 2017, and she attended eight of the fourteen meetings. Mother requested placement in an inpatient program, but Northwestern did not determine that inpatient treatment was necessary.

A therapist at the Laurel Center Intervention for Domestic and Sexual Violence also met with mother on May 31, 2017, for an intake session. However, mother did not appear for any of her three scheduled appointments following the initial session. Mother tested positive for cocaine in March 2017 and again in September 2017. In April 2017, the Laurel Center assisted mother with paying for an apartment in Winchester. The Center paid the first three months' rent for the

apartment, and mother agreed to make subsequent payments herself. However, mother was evicted for failure to pay rent in September 2017 and moved in with father.

In March 2018, mother entered the ARK, a sober-living home in West Virginia. Mother reported that she began working at McDonald's at this time. On March 16, 2018, DFS filed petitions in JDR court for termination of mother's and father's residual parental rights and for a permanency planning hearing, changing the original goal of reunification with the parents to adoption. Following an April 12, 2018 hearing, the JDR court entered orders terminating both parents' residual parental rights and approving the permanency plan. Mother appealed to the Loudoun County Circuit Court ("circuit court").[1]

In May 2018, mother moved to the Oxford House, a sober-living residence for women and children also located in West Virginia, where she was residing at the time of trial. She also changed employers and started working at Domino's. A different DFS caseworker, Natalie Palmer, was assigned to the family. Palmer reported that the children, who had resided with three separate foster families since April 2017, were doing "very well" in foster care.

On September 12 and 13, 2018, the circuit court conducted a *de novo* appeal of the JDR court's ruling. At that hearing, Palmer testified that to the best of her knowledge, mother had maintained sobriety for the nine months before trial, but Palmer was only aware of two drug tests during that time.

The court also received testimony from Florinda Reid, a child therapist who treated A.J. weekly from August 2017 until June 2018. Reid testified that she diagnosed A.J. with post-traumatic stress disorder ("PTSD"). She opined that reunification with a "healthy mother and achiev[ing] a permanent home" would help ease A.J.'s PTSD symptoms. Reid attempted to schedule an intake session with mother, but mother did not appear.

---

[1] Father did not appeal the JDR court's ruling terminating his residual parental rights.

The children's foster mother from September 2017 until June 2018 also testified at trial. She observed mother interact with the children during weekly visitations and found that mother was very interested in the "children's well-being, their health [and] their education." She believed mother was "genuinely . . . loving . . . to her children." She testified that after mother moved to West Virginia in March 2018, she continued her visitations via FaceTime.

Mother testified that she had a close relationship with her children prior to their removal in August 2016. She acknowledged that between that time and March 2018, she held approximately ten different jobs. She admitted that her drug use became "horrible" in September 2017, when she was living in Winchester, but asserted that she had maintained sobriety since entering the ARK in March 2018. Mother testified that she had no contact with father since March 2, 2018.

Mother presented testimony from her Narcotics Anonymous sponsor, who related that at the time of trial, mother was preparing to complete the first step of the twelve-step program. Tiffany Linville, the housing service representative from Oxford House, also testified on mother's behalf. She stated that mother had gone "above and beyond" the Oxford House requirements, including passing "four or five" drug tests. Linville informed the court that the Oxford House is a "place to get [women] back on [their] feet and ease [them] back into the world after coming out of addiction." Mother told the court that if she were reunited with her children, they would be permitted to live with her at the Oxford House where the family would share three of the bedrooms. Mother stated that she had applied for public assistance housing in Huntington, West Virginia.

Prior to trial, the circuit court granted mother's request to allow three witnesses, including her therapist, Thomas Lester, to testify by telephone or video conference. The order allowed mother's witnesses to "appear via FaceTime/Skype, or telephonic means if FaceTime will not work on the day of trial."

At the beginning of mother's case, her counsel indicated that although Lester was available to testify by FaceTime, counsel did not have an adapter to connect her phone to the court's television, so the testimony could be viewed only on counsel's phone. The court told counsel to obtain an adapter for Lester to testify via FaceTime so that all parties could view his testimony on the court's television. Alternatively, the court advised that it was equipped to receive testimony by Skype video conferencing. However, Lester did not have the necessary Skype application and declined to download it. Counsel told the court, "Mr. Lester is not going to testify. He wouldn't cooperate with downloading the necessary app[lication] so I don't have a choice there." Mother did not object to the court's ruling nor make a proffer of Lester's testimony. Mother's other two witnesses testified by Skype video conferencing.

At the trial's conclusion, the court determined that it was in the children's best interest to terminate mother's parental rights under Code § 16.1-283(B) and (C). The court noted that at the time of trial, the children had been in foster care for over two years, and although mother had made some progress, she "failed to make substantial progress" to remedy the conditions leading to the children's placement in foster care. It determined that mother's transitional housing situation, the Oxford House, was not "an appropriate environment for three young children," and it made observations about mother's failure to care for the children in the past, exposing them to drug use, domestic violence, and potential sexual abuse. Additionally, the court expressed concern about mother's credibility and personal responsibility, noting that she failed to acknowledge that her drug use and the family's instability had affected the children. She also denied accountability for her prior substance abuse and inability to complete services that DFS offered her.

The court acknowledged that although mother clearly loved her children and had been able to maintain sobriety for nine months, she was still without stable housing or employment and had not completed therapy for domestic violence. It also found that mother had not yet demonstrated

that she could maintain sobriety outside of a sober-living residence.  Further, it found that mother did not adequately communicate with DFS or avail herself of the services offered.  The court terminated mother's residual parental rights and approved the foster care plan with a goal of adoption.

ANALYSIS

A.  Refusal to Allow FaceTime Testimony

Mother contends that the court "violated the express terms" of its order allowing video and telephone testimony when it refused to allow mother's therapist, Thomas Lester, to testify via FaceTime on counsel's phone.  However, mother failed to object to the court's ruling and did not proffer Lester's expected testimony.  For these reasons, she did not preserve the matter for appeal.

Rule 5A:18 provides that "[n]o ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice."

> The laudatory purpose behind Rule 5A:18 . . . is to require that objections be promptly brought to the attention of the trial court with sufficient specificity that the alleged error can be dealt with and timely addressed and corrected when necessary.  The rules promote orderly and efficient justice and are to be strictly enforced except where the error has resulted in manifest injustice.

Redman v. Commonwealth, 25 Va. App. 215, 220 (1997) (quoting Brown v. Commonwealth, 8 Va. App. 126, 131 (1989)).  The rule also protects against unfairness to the "opposing party, who may have been able to offer an alternative to the objectionable ruling, but did not do so, believing there was no problem."  Lee v. Lee, 12 Va. App. 512, 514 (1991) (*en banc*).

Here, the court issued a pre-trial order permitting several of mother's witnesses, including her therapist, to "appear via FaceTime/Skype, or telephonic means if FaceTime will not work on the day of trial."  At trial, the court advised mother's counsel that she needed to procure an adapter to connect her phone to the court's television for Lester to testify via FaceTime, or Lester could

download Skype to testify by video on the television, so that all parties could view his testimony. After discovering that Lester would not download Skype and that she was unable to obtain an adapter, mother's counsel did not object to the court's interpretation of its order requiring an adapter for the FaceTime testimony to be viewed on the television. Counsel also did not request that the court allow Lester to testify solely by telephone as the order also provided. Instead, counsel informed the court that Lester would not "cooperate with downloading the necessary app[lication]," and therefore, would not be testifying. By failing to object to the court's decision that an adapter was required for testimony by FaceTime and provide any grounds for her objection, mother deprived opposing counsel of the opportunity to respond, and the court was unable to rule on her argument she now presents to this Court.

Further, mother did not proffer Lester's credentials or his expected testimony. "[W]hen evidence is excluded, the proponent must proffer for the record the nature of the expected evidence in order to preserve the ruling for appeal." Durant v. Commonwealth, 35 Va. App. 459, 466 (2001). See also Whittaker v. Commonwealth, 217 Va. 966, 968 (1977) ("[W]hen testimony is rejected before it is delivered, an appellate court has no basis for adjudication unless the record reflects a proper proffer."). The proffer allows this Court to determine whether the evidence was admissible, and if so, whether its exclusion prejudiced the aggrieved party. Tynes v. Commonwealth, 49 Va. App. 17, 21 (2006). See also Durant, 35 Va. App. at 466 ("Without such a proffer, the appellate court has no basis to determine whether the aggrieved party has been prejudiced by the ruling.").

Mother contends that Lester would have provided testimony about her domestic violence therapy. Without a proffer, neither the circuit court, nor this Court on appeal, can determine whether Lester's testimony would have proven that she successfully completed domestic violence therapy. Although we have held in certain limited circumstances that a proffer was not required where the defendant was precluded from cross-examining an essential witness, this was not the case

here where mother sought to call Lester on direct-examination.  See Edwards v. Commonwealth, 19 Va. App. 568, 572-73 (1995); Craig v. Commonwealth, 14 Va. App. 842, 845 (1995).  Mother was capable of proffering information about Lester's expected testimony, which "requires only that the litigant disclose what [s]he in good faith believes the witness would likely say."  Ray v. Commonwealth, 55 Va. App. 647, 652 (2010).

For these reasons, we find that mother's failure to object to the court's ruling and failure to proffer the expected testimony preclude us from considering this issue on appeal.

B.  Termination of parental rights pursuant to Code § 16.1-283(B) and (C)

Mother argues the court erred by finding that termination of her parental rights was in the children's best interests under Code § 16.1-283(B) and (C).  "When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is . . . the child's best interests."  Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991).  "On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'"  Id. at 128 (quoting Farley v. Farley, 9 Va. App. 326, 329 (1990)).  "Where the trial court hears the evidence *ore tenus*, its decision is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it."  Roanoke City Dep't of Soc. Servs. v. Heide, 35 Va. App. 328, 336 (2001).  "On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court."  Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 303 (2013).

Code § 16.1-283 sets forth the basis for termination of parental rights in Virginia.  The statute provides, in relevant part, as follows:

> B.  The residual parental rights of a parent or parents of a child found
> by the court to be neglected or abused and placed in foster care as

a result of (i) court commitment . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

1.  The neglect or abuse suffered by such child presented a serious and substantial threat to his life, health or development; and

2.  It is not reasonably likely that the conditions which resulted in such neglect or abuse can be substantially corrected or eliminated so as to allow the child's safe return to his parent or parents within a reasonable period of time. In making this determination, the court shall take into consideration the efforts made to rehabilitate the parent or parents by any public or private social, medical, mental health or other rehabilitative agencies prior to the child's initial placement in foster care.

    Proof of any of the following shall constitute prima facie evidence of the conditions set forth in subdivision B 2:

    . . . .

    c. The parent or parents, without good cause, have not responded to or followed through with appropriate, available and reasonable rehabilitative efforts on the part of social, medical, mental health or other rehabilitative agencies designed to reduce, eliminate or prevent the neglect or abuse of the child.

C.  The residual parental rights of a parent or parents of a child placed in foster care as a result of court commitment . . . may be terminated if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that:

1.  The parent or parents have, without good cause, failed to maintain contact with and to provide or substantially plan for the future of the child for a period of six months after the child's placement in foster care notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to communicate with the parent or parents and to strengthen the parent-child relationship. Proof that the parent or parents have failed without good cause to communicate on a continuing and planned basis with the child for a period of six months shall constitute prima facie evidence of this condition; or

- 10 -

2. The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end. Proof that the parent or parents, without good cause, have failed or been unable to make substantial progress towards elimination of the conditions which led to or required continuation of the child's foster care placement in accordance with their obligations under and within the time limits or goals set forth in a foster care plan filed with the court . . . shall constitute prima facie evidence of this condition.

Code § 16.1-283.

1. Termination under Code § 16.1-283(C) – Failure to Remedy Conditions Leading to Foster Care

Mother asserts that the court erred because it "placed more importance on the technical requirements of [Code] § 16.1-283(C) than on the threshold finding of the best interest of the [c]hildren." She argues that the court adhered too stringently to the twelve-month time period set forth in Code § 16.1-283(C)(2) and should have given more consideration to the progress she made after that period.

Termination of parental rights pursuant to Code § 16.1-283(C) requires the court to conduct two separate inquiries. Richmond Dep't of Soc. Servs. v. Crawley, 47 Va. App. 572, 579 (2006). First, the court must find that termination is in the best interests of the child. Code § 16.1-283(C); Crawley, 47 Va. App. at 579-80. In making this determination, the court must consider several factors including "the age and physical and mental condition of the child; the age and physical and mental condition of the parent; the relationship existing between the parent and the child; the needs of the child; . . . and any other such factors that are necessary." Thach v. Arlington Cty. Dep't of Human Servs., 63 Va. App. 157, 169 (2014).

- 11 -

The second inquiry "relates to the . . . remedying of the conditions that led to foster care." Crawley, 47 Va. App. at 579. The determination that a parent has not successfully remedied the conditions "hinge[s] not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271 (2005).

"The statute clearly contemplates that efforts to resolve the 'conditions' relevant to termination are constrained by time." Lecky v. Reed, 20 Va. App. 306, 312 (1995) (quoting Code § 16.1-283(C)(2)). The twelve-month time limit "was designed to prevent an indeterminate state of foster care 'drift' and to encourage timeliness by the courts and social services in addressing the circumstances that resulted in the foster care placement." L.G. v. Amherst Cty. Dep't of Soc. Servs., 41 Va. App. 51, 56 (2003). "This provision protects the family unit and attendant rights of both parents and child, while assuring resolution of the parent/child relationship without interminable delay." Id. (quoting Lecky, 20 Va. App. at 312).

Despite the time frame specified in the statute, "the factfinder may consider evidence before or after the twelve-month time period in order 'to evaluate the *present* best interests of the child.'" Thach, 63 Va. App. at 171 (quoting L.G., 41 Va. App. at 56). "The [circuit] court may [also] discount the parent's current 'progress' if the best interests of the child would be served by termination." Id. (quoting L.G., 41 Va. App. at 56).

Mother argues that the circuit court "disregarded her more recent progress in favor of what occurred during the statutory twelve months." We disagree. To the contrary, the court's findings demonstrate it considered her recent progress but found it insufficient to establish that she had substantially remedied the conditions that led to the children's placement in foster care. At the outset of the foster care placement, DFS identified the following goals necessary to return the children to mother: substance abuse and domestic violence counseling; remedying homelessness;

providing appropriate supervision and attention to the children; employment; proper money management; maintaining safe relationships; and maintaining a safe and clean environment where the children's needs could be met. In its ruling, the court noted that mother had maintained sobriety for the nine months preceding trial. However, mother had not yet demonstrated that she could remain sober outside of a sober-living residence. The court also concluded that mother failed to complete the other reunification goals such as maintaining stable housing in a suitable environment for children, holding steady employment, and completing domestic violence counseling.

The evidence supports the court's findings. Although mother testified that she ended her relationship with father, she attended only an intake session with a therapist at the Laurel Center Intervention for Domestic and Sexual Violence. She also did not disclose during her parental capacity evaluation any history of domestic violence, nor did she present evidence that her therapy with Lester addressed domestic violence. Therefore, the court was not plainly wrong in finding a lack of evidence that mother had successfully completed domestic violence therapy.

Further, the evidence at trial supported the court's finding that mother had not yet demonstrated an ability to maintain stable housing or employment outside of a sober-living residence. Mother entered sober-living programs in March 2018 at the ARK and subsequently at the Oxford House where she resided at the time of trial. Prior to entering the programs, mother lived at numerous residences, many of which she shared with father. Despite receiving financial assistance from both DFS and the Laurel Center, she was evicted from two apartments in August 2016 and September 2017. Because of the interim nature of sober-living residences and mother's demonstrated lack of self-sufficiency in establishing a stable home, the court concluded that mother had not yet met her goal of maintaining stable housing. The evidence also demonstrated ongoing employment instability. From the time that the children entered foster care in August 2016, mother

held approximately ten different jobs. She also had two separate employers in the six months preceding the circuit court trial.

The court considered mother's progress both before and after the twelve-month time frame set out in Code § 16.1-283(C) to evaluate the children's *present* best interests. See Thach, 63 Va. App. at 171. It concluded that while mother had made progress in maintaining sobriety for nine months, she had not substantially remedied the other conditions that led to the children's placement and continuation in foster care. At the time of the hearing, mother's three children, who were seven, five, and four years old, had been in foster care for over two years. One child had been diagnosed with PTSD. Although the court acknowledged that mother may continue her progress in the future, the record demonstrates it was not in the *present* best interest of the children to "wait a significant period of time to 'find out when, or even if, a parent will be capable of resuming [her] responsibilities.'" Eaton v. Dep't of Soc. Servs., 66 Va. App. 317, 332 (2016) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)). Therefore, the court's termination decision under Code § 16.1-283(C) was not plainly wrong or without evidence to support it.

2. Termination under Code § 16.1-283(B) – Compliance with DFS Services

Mother contends that the court "relied exclusively on the [m]other's failure to use the services of DFS in determining the best interest of the [c]hildren." However, the court's findings belie her argument. Like Code § 16.1-283(C), Code § 16.1-283(B) also requires consideration of the best interests of the children. Here, the record indicates that the court extensively evaluated the relevant factors necessary for this determination. As part of its best interest evaluation, the court considered mother's credibility and her failure to accept responsibility for any of the issues that caused the children to enter foster care. It was in the context of this analysis that the court noted mother's unwillingness to cooperate with the services DFS provided her. Because the court is required to consider several factors including "the mental condition of the parent . . . and any other

such factors that are necessary," in evaluating the best interests of the child, the court did not err by considering mother's lack of cooperation with DFS. <u>Thach</u>, 63 Va. App. at 169.

Further, the record indicates that the court considered whether mother made substantial progress using the alternative services she chose for herself in West Virginia. The court heard testimony from representatives at both sober-living homes where mother resided in West Virginia and from her Narcotics Anonymous sponsor. It also considered mother's own testimony about the substance abuse and domestic violence therapy she received and about her current housing and employment in West Virginia. Therefore, the court did not exclusively consider mother's failure to complete DFS services; rather, it properly evaluated all of mother's efforts to substantially correct or eliminate the conditions leading to the children's placement in foster care. <u>See</u> Code § 16.1-283(B)(2). It concluded from this inquiry that although mother had made progress by maintaining her sobriety, she still did not have a stable living situation for the children, her employment history was sporadic, and she had not completed therapy for domestic violence.

For these reasons, the court did not err by finding that termination of mother's parental rights was in the children's best interests under Code § 16.1-283(B) and (C).

### C. Approval of Adoption Permanency Planning Goal under Code § 16.1-282.1

Mother argues that because the evidence was insufficient to support the termination of her parental rights, the court's decision to approve a permanency goal of adoption was also in error. She asserts no other argument in support of this assignment of error. Because the court did not err in terminating mother's parental rights, it also did not err in approving the permanency goal of adoption.

### CONCLUSION

We find that mother did not preserve her claim that the court improperly excluded testimony from Thomas Lester and that the evidence was sufficient to find that it was in the best interests of

- 15 -

the children to terminate mother's residual parental rights and accept the foster care plan with a goal of adoption. Accordingly, the judgment of the trial court is affirmed.

<u>Affirmed.</u>
